**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

Case No. 1:22-cv-23170

CARDINAL POINT, LLC,
a Florida limited liability company,
ALEXANDER SORIA, TONY RODRIGUEZ,
KENNETH KNOPP, and RANDY BAKER,

      Plaintiffs,

v.

EPIC HOLDINGS, INC., and
EDGEWOOD PARTNERS INSURANCE
CENTER, INC., doing business as
EPIC INSURANCE BROKERS &
CONSULTANTS,

      Defendants.
_____/

**COMPLAINT**

Plaintiffs Cardinal Point, LLC, Alexander Soria, Tony Rodriguez, Kenneth Knopp, and Randy Baker sue Defendants EPIC Holdings, Inc. and Edgewood Partners Insurance Center, for damages, and allege as follows:

**The Parties, Jurisdiction, and Venue**

1. Plaintiff Cardinal Point, LLC (**"Cardinal"**) is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. It is a reinsurance distribution company providing managed care reinsurance and stop loss products. Together, Messrs. Soria, Rodriguez, Knopp, and Baker own 100% of the issued and outstanding shares of Cardinal.

2. Plaintiff Alexander Soria is a resident of Miami-Dade County, Florida, who is over eighteen years of age and is otherwise *sui juris*.

3. Plaintiff Tony Rodriguez is a resident of Miami-Dade County, Florida, who is over eighteen years of age and is otherwise *sui juris*.

4. Plaintiff Kenneth Knopp is a resident of Tennessee who is over eighteen years of age and is otherwise *sui juris*.

5. Plaintiff Randy Baker is a resident of Colorado who is over eighteen years of age and is otherwise *sui juris*.

6. Defendant EPIC Holdings, Inc. ("**EPIC Holdings**") is a Delaware corporation.

7. Defendant Edgewood Partners Insurance Center, Inc. ("**EPIC**") is a California corporation doing business as EPIC Insurance Brokers & Consultants. It is registered to do business in Florida and has an office in Miami-Dade County, Florida located at 135 San Lorenzo Ave., Suite 630, Coral Gables, Florida 33146.

8. This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332 because this matter involves a claim for damages in excess of $75,000, exclusive of interest, costs, and attorneys' fees, and there is complete diversity between Plaintiffs and Defendants.

9. Defendant EPIC Holdings is subject to personal jurisdiction because it consented to the jurisdiction of any state or federal court located in Miami, Florida. Defendant EPIC is subject to personal jurisdiction because it is bound by EPIC Holdings' consent to jurisdiction in any state or federal court in Florida and EPIC's contacts in and with the State of Florida are substantial, continuous, and systematic such that subjecting

EPIC to jurisdiction in Florida does not offend traditional notions of fair play and substantial justice.

10. Venue in Miami-Dade County, Florida is proper pursuant to 28 U.S.C. § 1391(b)(2) and (3), and the mandatory venue provision agreed to by the parties.

## General Allegations

11. Messrs. Soria, Rodriguez, Knopp, and Baker are well-known and highly regarded healthcare reinsurance specialists with decades of experience and success.

12. Reinsurance, also known as insurance for insurers, involves insurers sharing their risk portfolios with other parties which reduces their net liability and protects against one insurance company having too much exposure and being financially unable to pay covered claims. Plaintiffs service a niche, commonly called the managed care market, comprising HMOs and health plans within the larger reinsurance industry.

13. The managed care market is extremely small, comprising approximately 300 prospective clients, the majority of which are health plans owned by health systems (hospitals). While there is significant competition in the niche, there are a limited number of competitors, due primarily to the limited number of prospective customers.

14. The standard product sold is a reinsurance agreement with a 12 month term. While the term of the agreement is for 12 months, the sales cycle typically includes years of prospecting and relationship building with each prospective client, as the decision to enter into the reinsurance contract includes the expectation of subsequent renewals. The typical reinsurance relationship lasts 3 to 5 years.

15. The average revenue generated from these reinsurance contracts is $150,000 per year. The majority (as much as 80%) of the contracts in this niche are effective January 1st. Given the timing and size of the contracts, it is not unusual to experience significant revenue growth in one year.

16. Through hard work and good advice, Messrs. Soria, Rodriguez, Knopp, and Baker have earned the trust of numerous customers and health plan executives who count on their advice in choosing reinsurance products and providing high-level service during the applicable policy period. In other words, Messrs. Soria, Rodriguez, Knopp, and Baker are not merely introducing reinsurance brokers. They provide a variety of services to their clients, including but not limited to, assisting with the submission of, and any issues with, reinsurance claims, and regularly communicating with HMO and health plan executives regarding reinsurance products to cover both current and anticipated future needs.

17. Between 2016 and 2018, Plaintiffs earned an average annual profit margin of approximately 47% based on average annual profit of approximately $1,486,162 and average annual revenue of approximately $3,134,453.

18. Plaintiffs well-earned success garnered the attention of, among others interested parties, Integro USA (**"Integro"**), a large insurance brokerage and specialty risk management firm.

19. In or about late 2018, Integro expressed interest in acquiring Cardinal and employing Messrs. Soria, Rodriguez, Knopp, and Baker. Those discussions paused because Integro was acquired by EPIC Holdings in December 2018. However, once EPIC Holdings'

acquisition of Integro was finalized, EPIC Holdings stepped into Integro's shoes and resumed discussions with Plaintiffs regarding acquiring Cardinal.

### A. EPIC Holdings acquires Cardinal's assets and Messrs. Soria, Rodriguez, Knopp, and Baker join EPIC.

20. On or about August 16, 2019, Plaintiffs and EPIC Holdings entered into an Asset Purchase Agreement (the **"Purchase Agreement"**), a true and correct copy of which is attached hereto as Exhibit 1.

21. It was a great deal for EPIC Holdings as it acquired Cardinal's assets for **no money upfront**. Pursuant to Section 3.01 of the Purchase Agreement, EPIC Holdings and Plaintiffs agreed that the purchase price would be determined four (4) years later and that it would equal (a) the amount of Cardinal Business Revenue for the twelve (12) month period beginning August 1, 2022 through July 31, 2023, and (b) the applicable revenue multiple determined in accordance with the following table attached as Exhibit A to the Purchase Agreement:

Exhibit A

Purchase Price Table

The Purchase Price shall be calculated in accordance with the below Purchase Price Table. In the event that the Cardinal Business Revenue does not reach $2,500,000 in the Final Measurement Period, the Purchase Price shall equal $100.

For purposes of this Purchase Price Table, "*EBITDA Range*" means the quotient of (a) EBITDA divided by (b) the Cardinal Business Revenue.

| **Cardinal Business Revenue** | **EBITDA Range** | **Revenue Multiple** |
|---|---|---|
| $2,500,000 to $3,500,000 | Above 20% | 0.50 |
| $3,500,000 to $4,000,000 | 20-25% | 0.75 |

| $3,500,000 to $4,000,000 | 25-30%   | 1.00 |
| $3,500,000 to $4,000,000 | 30-35%   | 1.25 |
| $3,500,000 to $4,000,000 | Above 35% | 1.50 |
| $4,000,000 to $5,000,000 | 20-25%   | 1.00 |
| $4,000,000 to $5,000,000 | 25-30%   | 1.25 |
| $4,000,000 to $5,000,000 | 30-35%   | 1.50 |
| $4,000,000 to $5,000,000 | Above 35% | 1.75 |
| $5,000,000 to $7,000,000 | 20-25%   | 1.50 |
| $5,000,000 to $7,000,000 | 25-30%   | 1.75 |
| Above $5,000,000         | 30-35%   | 2.00 |
| Above $5,000,000         | Above 35% | 2.25 |

22. In other words, EPIC Holdings and Plaintiffs understood and agreed that year (4) four (between August 1, 2022 and July 31, 2023) was the crucial year for determining the amount EPIC Holdings would be obligated to pay for acquiring Cardinal's assets.

23. As part of the transaction and as referenced in the Purchase Agreement, Messrs. Soria, Rodriguez, Knopp, and Baker entered into executive employment agreements with EPIC Holdings' subsidiary, EPIC, who drafted the agreements. True and correct copies of the employment agreements (collectively, the **"Employment Agreements"**) are attached hereto as Exhibits 2, 3, 4, and 5, respectively. The Employment Agreements are substantively the same except for individual titles and base salaries. With respect to compensation, Mr. Soria's Employment Agreement provides as follows:

> **6.1 Annual Compensation.** Subject to adjustment as set forth herein, for the first forty-eight month (48) period commencing on the

6

> effective date of this Agreement, Employer shall pay to Executive annual cash compensation equal to a base salary of $275,000 (two hundred seventy-five thousand dollars) ("Base Salary"). If the compensation paid to Executive and the other employees comprising the Cardinal Unit during the first thirty-six month (36) month period commencing on the effective date of this Agreement exceeds that certain percentage of the annualized Revenue (as defined in the Asset Purchase Agreement among EPIC Holdings Inc. and Cardinal Point, LLC and its members) of the Cardinal Unit set forth in the table below, then the Base Salary along with the compensation of such other Cardinal Unit employees shall be reduced proportionately.
>
> *Months 12 through 24 Maximum compensation to Revenue ratio of 75%*
> *Months 24 through 36 Maximum compensation to Revenue ratio of 65%*
>
> After 48 months an annual bonus plan shall be developed in consideration of Executive's contribution to the Cardinal Unit's business unit meeting and exceeding the profit margin and revenue growth expectations reasonably set for the Cardinal Point business unit each year. The Base Salary shall be payable in accordance with Employer's customary payroll practices and procedures and, as with all compensation payable under this Agreement, less withholdings for State and Federal income tax, FICA, FUTA, and other required statutory deductions. All compensation shall be prorated for any partial period during a calendar year, provided that to be eligible for the annual bonus Executive Employer as of the Employer's regular bonus payment date each year.

Ex. 2 at § 6.1.

24. The Employment Agreements for Messrs. Rodriguez, Knopp, and Baker contain same language as above except their annual base salaries are $225,000, $200,000, and $200,000, respectively. *See* Exs. 3–5 at § 6.1.

25. In announcing the deal, EPIC's managing principal Peter Robinson stated, "We have known and highly respected Alex, Tony, Randy and Ken for many years," and

"[t]heir addition to our team is another exciting step forward for EPIC Re and our Health Plan Reinsurance Advisory strategy."[1]

26.     Plaintiffs were excited too. EPIC Holdings agreed that Cardinal would be the "featured platform" for EPIC Holdings' health plan reinsurance and stop loss division and that "[a]bsent a business similar to the Cardinal Business being embedded in a larger acquisition, [EPIC Holdings] will not strategically target or acquire a similar business during the Earnout Period [of August 16, 2019 through August 15, 2023] without [Cardinal's] written consent." Ex. 1 at § 8.09. EPIC Holdings' promise was important to Plaintiffs because the addition of similar reinsurance businesses and professionals might divert business otherwise captured by Plaintiffs. In addition, the ability to pitch the Cardinal team as EPIC Holdings' featured platform for health plan reinsurance would be advantageous for marketing purposes and earning business.

27.     EPIC Holdings' promise to support Plaintiffs in developing new business by, "among other things, providing reasonable access to the resources (business contacts, vendors, suppliers, markets, etc.) of [EPIC Holdings]" was also a significant factor for Plaintiffs moving forward with the deal. Ex. 1 at § 8.12.  Plaintiffs expected EPIC Holdings to refer and put Plaintiffs in touch with prospective health plan reinsurance clients who might already be EPIC customers but not use EPIC for their reinsurance needs, as well as enable Plaintiffs to offer ancillary insurance products, such as liability coverage, to their prospects.

---

[1]     *Founders of RBS Re Join Epic Insurance Brokers and Consultants as Part of Growing Epic Reinsurance Unit*, available at https://www.send2press.com/wire/founders-of-rbs-re-join-epic-insurance-brokers-and-consultants-as-part-of-growing-epic-reinsurance-unit/, August 22, 2019.

**B.     Plaintiffs' early success and vigorous relationship building efforts.**

28.     In the first six months following deal, Plaintiffs did exceptionally well, earning $1.2 million in new business. That amount was particularly impressive because the overwhelmingly majority of reinsurance policy revenue is captured as of January 1, when policies typically begin or renew. However, reinsurance customers do not select and change insurers on a whim. Instead, those decisions are typically made 6 to 8 months in advance of January 1. Accordingly, earning $1.2 million in new business during the last quarter of 2019 and first quarter of 2020 was a stellar result and a testament to Plaintiffs' hard work and relationship building with prospective clients.

29.     Plaintiffs' impressive start put them among EPIC's top revenue producers for the entire year of 2020. Indeed, Mr. Knopp was among EPIC's top 10 revenue producers and was lauded across the company as part of the "Summit Club" for top producers.

30.     Plaintiffs were pleased with their start but even more excited for the following year as they had several prospective clients who were interested in using Plaintiffs as their reinsurance brokers and switching to EPIC's reinsurance products for the January 1, 2021 to December 31, 2021 policy period.

31.     Based on Cardinal's performance, Cardinal and EPIC Holdings projected that Cardinal would realize a purchase price valuation of more than $11 million in August 2023.

32.     Then the worldwide COVID-19 pandemic struck. Countless industries and businesses were adversely impacted.

33.     Cardinal's business was no exception. Earning new business became challenging as potential health plan reinsurance customers, of which there are only

approximately 300 in the country, were loath to change reinsurance providers until the pandemic dissipated. Moreover, many of Plaintiffs' prospective clients were hospital systems dealing with a variety of challenges caused by the COVID-pandemic and changing reinsurance providers was not a priority. It was therefore not surprising that Cardinal's revenue (and that of other EPIC reinsurance business units) slowed considerably for 2021 and 2022.

34. The pandemic did not deter the efforts of Messrs. Soria, Rodriguez, Knopp, and Baker, however. In addition to serving existing clients, Messrs. Soria, Rodriguez, Knopp, and Baker continued to pitch and educate prospective clients regarding the benefits of bringing their reinsurance business and other insurance needs to EPIC and brought in as much new business as possible. In addition, Messrs. Soria, Rodriguez, Knopp, and Baker integrated themselves within EPIC's culture, Reinsurance Team, and Salesforce system. They were also praised for taking on the relationship management with Banner Health, a high profile and pre-existing EPIC reinsurance customer who had informed EPIC that a new lead reinsurance broker was needed to service their account going forward. Plaintiffs continue to manage the reinsurance relationship with Banner Health.

35. Messrs. Soria, Rodriguez, Knopp, and Baker were confident that their efforts during the height of the pandemic would bear fruit in the early part of 2022 and result in new business during August 1, 2022 and July 31, 2023—the crucial time period for measuring Cardinal's business revenue for determining the purchase price for Cardinal.

### C. Defendants break their promises and make unreasonable demands not supported by the parties' agreements.

36. Beginning in or around the second half of 2021 and continuing through the date of this filing, Defendants have engaged in a pattern of misconduct intended to harm Plaintiffs' reputations and market relationships, and thwart Plaintiffs' ability to bring in business during the crucial fourth year.

37. Defendants have targeted competitors with business similar to Cardinal's business which were not embedded units part of larger acquisitions. Defendants have done this with at least the following reinsurance brokers and their businesses: (i) Ellen Anhut; (ii) Dan Melanson; (iii) Jason Alvarez; (iv) Mary Sullivan; (v) Chuck Newton; and (vi) Ross Downing.

38. By targeting the foregoing competitors and similar businesses, causing the close-knit reinsurance industry to perceive that EPIC Holdings is looking to separate from Plaintiffs and that the Cardinal business unit is not the "featured platform" of EPIC Holdings' health plan reinsurance, EPIC Holdings has damaged Messrs. Soria's, Rodriguez's, Knopp's, and Baker's reputations and market relationships, and materially breached Sections 8.09 and 8.12 of the Purchase Agreement.

39. Similarly, by targeting Plaintiffs' competitors, EPIC knew that it would impair the goodwill and reputations of Messrs. Soria, Rodriguez, Knopp, and Baker by, among other harm, causing the close-knit reinsurance industry to perceive that EPIC is looking to replace them and that the Cardinal business unit is not the "featured platform" of EPIC Holdings' health plan reinsurance. EPIC's actions are a breach of the non-disparagement provision in Section 10 of the Employment Agreements providing that "[d]uring the Term

11

and at any time thereafter neither Executive nor Employer shall directly or indirectly . . . knowingly engage in any other conduct or make any other statement that is likely to impair the goodwill or reputation of the other party." Exs. 2-5 at § 10.

40.     Further, and as opposed to late 2019 and 2020, where Defendants involved Plaintiffs in annual budgetary planning for 2020 and 2021, Defendants completely excluded Plaintiffs from any budgetary planning discussions for 2022.

41.     As it turns out, Defendants' breaches were and are part of a broader plan to attempt to thwart Plaintiffs' ability to bring in new business and force Plaintiffs to agree to a premature separation prior to the end of the crucial August 1, 2022 through July 31, 2023 time period for determining the purchase price for Cardinal's assets.

42.     In that regard, on or about January 11, 2022, Defendants' President of Risk Management & National Specialties Marc Kunney surprised Plaintiffs by demanding that Plaintiffs develop a plan to separate from Defendants within thirty (30) days.

43.     The significance of Defendants' separation demand cannot be overstated. It came at the beginning of an important 4 to 5-month period when the majority of new business (for policies beginning January 1 of the next year) is captured, and approximately 8 months prior to the beginning of Plaintiffs' crucial fourth year.

44.     Moreover, Defendants' demand evidenced that Cardinal was not and is not the "featured platform" of EPIC Holdings' health plan reinsurance, as EPIC Holdings promised in the Purchase Agreement, and that Defendants desire to cut all ties with Plaintiffs.

45.     As Defendants know well, convincing a prospective reinsurance client to change insurers and bring their business to EPIC is the result of cultivating and maintaining long-term relationships and the client's expectation that Messrs. Soria, Rodriguez, Knopp, and Baker will service the new client account for as long as the client uses EPIC for reinsurance needs. By demanding separation and effectively telling Messrs. Soria, Rodriguez, Knopp, and Baker that their days at EPIC are and were numbered, Defendants frustrated and hindered Plaintiffs' ability to pursue prospective clients because to do so would require Messrs. Soria, Rodriguez, Knopp, and Baker to mislead those prospective clients, many of which are relationships cultivated over more than a decade, regarding their current and future employment with EPIC. Indeed, the Employment Agreements prohibit Messrs. Soria, Rodriguez, Knopp, and Baker from informing current and prospective clients that their employment with EPIC is or may be ending. Exs. 2-5 at § 11.2(b). In other words, even if Plaintiffs refused to agree to separate prior the crucial fourth year, Defendants knew and intended that their separation demand would frustrate and hinder Plaintiffs' ability to succeed in year four and obtain a meaningful purchase price for Cardinal.

46.     In addition, Defendants' separation demand was the antithesis of EPIC Holdings' promise in Section 8.12 of the Purchase Agreement to support Plaintiffs in developing business during the Earnout Period, including the crucial fourth year.

47.     Plaintiffs objected to Defendants' separation demand because, among other reasons, (i) it is and was wholly unsupported by any agreement between Plaintiffs and

Defendants and (ii) it would deny Plaintiffs the ability to achieve the year four success and purchase price valuation that they had been working towards for twenty-nine months.

48.     Frustrated that their initial attempt at separation had failed and in furtherance of their plan to prevent Plaintiffs from bringing in new business during the crucial fourth year for determining the purchase price under the Purchase Agreement, Defendants became more unreasonable and aggressive.

49.     In February 2022 and thereafter, Defendants' general counsel Dan Crawford informed Messrs. Soria, Rodriguez, Knopp, and Baker that their base salaries would be reduced as of August 2022 to achieve a 25% profit margin for Cardinal's business unit. According to Defendants' calculations, the salary reduction would result in Messrs. Soria's, Rodriguez's, Knopp's, and Baker's collective base salaries being decreased from an annual collective total of $900,000 to approximately $282,859, a reduction of $617,141 or approximately 69%.

50.     Furthermore, Defendants knew that in addition to the drastic reduction in base salaries, Messrs. Soria's, Rodriguez's, Knopp's, and Baker's ability to solicit business would be severely restricted because all travel and marketing expenses would also have to be reduced to meet the arbitrary 25% margin.

51.     Like their earlier separation demand, Defendants' arbitrary 25% profit margin demand was wholly unsupported by any agreement between the parties. Accordingly, Plaintiffs objected.

52.     Notwithstanding Plaintiffs' protestations and the lack of any supporting contractual language, between February 2022 and August 3, 2022, Defendants did not back

off their threat to reduce Messrs. Soria's, Rodriguez's, Knopp's, and Baker's base salaries to achieve a 25% profit margin for Cardinal's business unit.

53. On August 4, 2022, EPIC informed Messrs. Soria, Rodriguez, Knopp, and Baker that effective August 16, 2022—mere weeks after the three-year anniversary of the Purchase Agreement and the beginning of the crucial fourth year—their base salaries would be reduced to achieve a 65% compensation to revenue ratio.

54. EPIC provided Messrs. Soria, Rodriguez, Knopp, and Baker with a calculation reeking of bad faith and intentional wrongdoing as it was riddled with errors and unilateral adjustments unsupported by any contractual language between the parties. According to EPIC, Messrs. Soria's, Rodriguez's, Knopp's, and Baker's base salaries would be reduced from an annual total of $900,000 to 285,600, a decrease of $614,400 and only slightly less than Defendants' threatened 25% profit margin reduction.

55. Messrs. Soria, Rodriguez, Knopp, and Baker objected to EPIC's calculations and provided a correct calculation consistent with the terms of the parties' agreements. EPIC agreed to make some adjustments but refused to make others and submitted another worksheet showing a salary adjustment of $469,131.  Again, Plaintiffs objected and communicated that they did not agree with EPIC's revised adjustment.

56. EPIC responded with a third, but still flawed and unexplained calculation, and owes Messrs. Soria, Rodriguez, Knopp, and Baker at least $37,745.

57. In sum, during the first 8 months of 2022—the most important period of time for capturing new business for the crucial fourth year—Defendants (i) demanded separation, (ii) frustrated and hindered Plaintiffs' ability to bring in new business by,

among other things, effectively requiring Plaintiffs to mislead prospective clients; (iii) effectively terminated Plaintiffs' ability to solicit new business by imposing an arbitrary 25% margin requirement; (iv) repeatedly threated to drastically reduce base salaries by approximately 70% based on language absent from the parties' agreements or applied in manner reeking of bad faith, (v) failed to support Plaintiffs in developing new business, (vi) failed to utilize Cardinal as the featured platform for health plan reinsurance, (vii) damaged Messrs. Soria's, Rodriguez's, Knopp's, and Baker's reputations and market relationships, and (viii) actively sought to bring on Plaintiffs' competitors independently and not as part of a larger acquisition.

58. Plaintiffs have retained the law firm Homer Bonner Jacobs Ortiz, P.A. to represent them in this action and are obligated to pay reasonable attorneys' fees and costs.

59. All conditions precedent to the bringing of this lawsuit have occurred or been satisfied or waived.

**Count I: Breach of the Purchase Agreement**
**(Plaintiffs Against EPIC Holdings)**

60. Plaintiffs reallege and incorporate paragraphs 1 through 59, inclusive, as if specifically and fully set forth herein.

61. Plaintiffs and EPIC Holdings entered into a valid and enforceable contract referenced herein as the Purchase Agreement.

62. EPIC Holdings materially breached the Purchase Agreement.

63. Plaintiffs performed their obligations under the Purchase Agreement.

64. Plaintiffs have suffered and are continuing to suffer damages directly and proximately caused by EPIC Holdings' misconduct.

WHEREFORE, Plaintiffs demand judgment against EPIC Holdings for damages, costs, expenses, and interest, and such other and further relief as the Court deems just and proper.

**Count II: Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(Plaintiffs Against EPIC Holdings)**

65. Plaintiffs reallege and incorporate paragraphs 1 through 59, inclusive, as if specifically and fully set forth herein.

66. Plaintiffs and EPIC Holdings entered into a valid and enforceable contract referenced herein as the Purchase Agreement.

67. An implied covenant of good faith and fair dealing exists between EPIC Holdings and Plaintiffs regarding the Purchase Agreement.

68. Plaintiffs did all, or substantially all, of the significant things that the Purchase Agreement required of them or they were excused from having to do those things by virtue of EPIC Holdings' misconduct.

69. All conditions required for EPIC Holdings' performance had occurred.

70. EPIC Holdings' actions unfairly interfered with, hindered and frustrated Plaintiffs' contractual rights.

71. EPIC Holdings' conduct did not comport with Plaintiffs' reasonable contractual expectations that EPIC Holdings would not interfere with, frustrate, or hinder Plaintiffs' ability to bring new business to EPIC during the Earnout Period and, most importantly, during the crucial fourth year for determining the purchase price EPIC Holdings must pay to Cardinal.

72. Plaintiffs have suffered and are continuing to suffer damages directly and proximately caused by EPIC Holdings' misconduct.

WHEREFORE, Plaintiffs demand judgment against EPIC Holdings for damages, costs, expenses, and interest, and such other and further relief as the Court deems just and proper.

### Count III: Breach of the Employment Agreements
### (The Individual Plaintiffs Against EPIC)

73. Messrs. Soria, Rodriguez, Knopp, and Baker (the **"Individual Plaintiffs"**) reallege and incorporate paragraphs 1 through 59, inclusive, as if specifically and fully set forth herein.

74. The Individual Plaintiffs and EPIC entered into valid and enforceable contracts referenced herein as the Employment Agreements.

75. EPIC materially breached the Employment Agreements.

76. The Individual Plaintiffs performed their obligations under the Employment Agreements.

77. The Individual Plaintiffs have suffered and are continuing to suffer damages directly and proximately caused by EPIC's misconduct.

WHEREFORE, the Individual Plaintiffs demand judgment against EPIC for damages, costs, expenses, and interest, and such other and further relief as the Court deems just and proper.

Date: September 30, 2022.

                                  Respectfully submitted:



Attorneys for Plaintiffs
1200 Four Seasons Tower
1441 Brickell Avenue
Miami Florida 33131
Phone: (305) 350-5100
Fax: (305) 372-2738

By:  */s/Andrew Vitali, III*
      Jose A. Ortiz, Esq.
      Email: jortiz@homerbonner.com
      Florida Bar No. 182321
      Andrew Vitali, III, Esq.
      Email: avitali@homerbonner.com
      Florida Bar No.: 57828