**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-23170-CIV-ALTONAGA/Damian**

**CARDINAL POINT, LLC**; *et al.*,

      Plaintiffs,

v.

**EDGEWOOD PARTNERS**
**INSURANCE CENTER, INC.**, *et al.*,

      Defendants.

_____/

**<u>ORDER</u>**

**THIS CAUSE** came before the Court on Defendants, EPIC Holdings, Inc. and Edgewood

Partners Insurance Center, Inc.'s (together "EPIC['s]") Motion for Partial Summary Judgment

[ECF No. 48]. Plaintiffs, Cardinal Point, LLC ("Cardinal"), Alex Soria, Tony Rodriguez, Kenneth

Knopp, and Randy Baker, filed a Response [ECF No. 64]; to which Defendants filed a Reply [ECF

No. 67]. The Court has carefully considered the parties' written submissions,[1] the record, and

applicable law.

**I. INTRODUCTION**

This case is about a deteriorating business relationship between Plaintiffs and Defendants

following EPIC's 2019 acquisition of Cardinal, a Florida limited liability company that sells

healthcare-related reinsurance policies. Cardinal's Members, Soria, Rodriguez, Knopp, and Baker

---

[1] The parties' factual submissions include Defendants' Statement of Material Facts in Support of Motion for Partial Summary Judgment [ECF No. 49] ("SOF") and supporting exhibits; Plaintiffs' Statement of Material Facts in Opposition to Defendants' Motion for Partial Summary Judgment [ECF No. 65] ("Resp. SOF") and supporting exhibits; and Defendants' Reply Statement of Materials Facts in Support of Motion for Partial Summary Judgment [ECF No. 67] ("Reply SOF") and supporting exhibits.

(the "Members"), are self-described healthcare reinsurance specialists who collectively own 100% of Cardinal. The companies that comprise EPIC[2] are insurance brokerage companies.

In 2019, after much negotiation, EPIC acquired Cardinal via an Asset Purchase Agreement and entered into Employment Agreements with the Members. Thereafter, unhappy with Cardinal's and the Members' performance, EPIC reduced the Members' salaries and ultimately terminated their employment. Plaintiffs allege EPIC's actions leading up to the Members' terminations breached the Asset Purchase Agreement and Employment Agreements and violated the implied covenant of good faith and fair dealing.

EPIC now seeks summary judgment on Plaintiffs' breach of contract claims and breach of implied covenant of good faith and fair dealing claim, and partial summary judgment on Plaintiffs' damages theories. Upon review, the Court concludes summary judgment is inappropriate except as to one theory of breach of the implied covenant of good faith and fair dealing.

## II. BACKGROUND

After many years of working in the healthcare reinsurance industry, the Members' "success garnered the attention of" insurance brokers interested in acquiring Cardinal, including Integro USA, a large insurance brokerage and specialty risk management firm. (Resp. 6 (citation omitted); *see* SOF ¶ 4; Resp. SOF ¶¶ 4, 60; Reply SOF ¶ 60). In 2018, Cardinal began negotiations with Integro USA. (*See* SOF ¶ 4; Resp. SOF ¶ 4). As part of these negotiations, Soria prepared projections of Cardinal's performance based on the Members' experience, historical performance,

---

[2] The parties refer to Defendants in the collective throughout their briefing, and Defendants admit they are "operationally the same[.]" (Resp. SOF ¶ 61 (alteration added); *see* Reply SOF ¶ 61). The Court refers to Defendants collectively as EPIC, referring to Defendants individually only where necessary.

and projected performance.  (*See* SOF ¶ 6; Resp. SOF ¶ 6).  The projections included the following estimated year over year revenue and profit growth for Cardinal:

|  | **2019** | **2020** | **2021** | **2022** |
|---|---|---|---|---|
| **Revenue** | $1,495,710 | $2,354,274 | $3,626,267 | $5,035,750 |
| **Profit (Loss)** | ($123,205) | $310,477 | $1,033,661 | $2,173,302 |
| **EBITDA[3] Percentage** | -8% | 13% | 29% | 43% |

(*See* SOF ¶ 6; Resp. SOF ¶ 6).

Historically, Cardinal operated under a distribution agreement with HM Life Insurance Company; it "sold HM Life products direct to health plans and providers and through brokers." (SOF ¶¶ 1–2; *see* Resp. SOF ¶¶ 1–2).  EPIC contends that "[b]efore 2019, Cardinal never operated as an insurance broker[;]" that is, an entity that "represents the customer, rather than the insurance carrier[.]"  (SOF ¶ 5 (alterations added)).  Plaintiffs maintain they "competed with other brokers selling health plan reinsurance policies to prospective customers" (Resp. SOF ¶ 5) but admittedly "were not licensed as brokers and did not perform that service" prior to joining EPIC (SOF, Composite B [ECF No. 49-2], Soria Dep. 70:7–11).  Nonetheless, Soria felt "pretty confident, given the circumstances and [the Members'] relationships, that [they could] secure 12 customers in the first 12 months and 25 to 30 in 3 years."  (Resp. SOF ¶ 6 (alterations added; other alteration adopted; quotation marks and citation omitted)).

In early 2019, EPIC acquired Integro and continued discussions with the Members regarding a potential acquisition of Cardinal.  (*See* SOF ¶ 4; Resp. SOF ¶ 4).  After many months, in August 2019, the parties closed the transaction.  (*See* SOF ¶ 20; Resp. SOF ¶ 20).  EPIC and Cardinal signed an Asset Purchase Agreement (*see* SOF, Composite G [ECF No. 49-7] 6–54

---

[3] EBITDA stands for earnings before interest, taxes, depreciation, and amortization.  *See* Adam Hayes, *EBITDA: Definition, Calculation Formulas, History, and Criticisms*, INVESTOPEDIA (Nov. 3, 2023), https://www.investopedia.com/terms/e/ebitda.asp.

("APA")); and the Members each executed Employment Agreements with EPIC (*see* SOF ¶ 20; Resp. SOF ¶ 20; SOF, Composite A [ECF No. 49-1] 298–313 ("Rodriguez Employment Agreement"); *id.*, Composite B 98–113 ("Soria Employment Agreement"); *id.*, Composite C [ECF No. 49–3] 32–46 ("Knopp Employment Agreement"); and *id.*, Composite D [ECF No. 49-4] 19–34 ("Baker Employment Agreement")). [4]

Money-wise, EPIC paid nothing up front to purchase Cardinal.  Instead, the APA outlined that the purchase price would be determined by Cardinal's "future performance under an earnout formula of revenue and EBITDA . . . , measured in the fourth year after closing, with a minimum threshold of $2.5M in revenue and EBITDA above 20%."  (SOF ¶ 11 (alteration added; citation omitted); *see* Resp. SOF ¶ 11).  In other words, the parties agreed to calculate the purchase price based on Cardinal's performance between August 1, 2022 and July 31, 2023.  The Members would be paid salaries as follows:

> **6.1 Annual Compensation.** Subject to adjustment as set forth herein, for the first forty-eight month (48) period commencing on the effective date of this Agreement, Employer shall pay to Executive annual cash compensation equal to a [BASE SALARY].  If the compensation paid to Executive and the other employees comprising the Cardinal Unit during the first thirty-six month (36) month period commencing on the effective date of this Agreement exceeds that certain percentage of the annualized Revenue (as defined in the Asset Purchase Agreement among EPIC Holdings Inc. and Cardinal Point, LLC and its members) of the Cardinal Unit set forth in the table below, then the Base Salary along with the compensation of such other Cardinal Unit employees shall be reduced proportionately.

> *Months 12 through 24    Maximum compensation to Revenue ratio of 75%*
> *Months 24 through 36    Maximum compensation to Revenue ratio of 65%*

(Employment Agreements § 6.1 (alteration added)).

---

[4] The Employment Agreements are identical in all respects save for the title and salary of each Member. (*Compare* Rodriguez Employment Agreement *with* Soria Employment Agreement, Knopp Employment Agreement, *and* Baker Employment Agreement).  The Court refers to and cites the Employment Agreements collectively.

The contracts include many provisions that benefit Plaintiffs, three of which are relevant here.  First, each Employment Agreement includes a non-disparagement provision, as follows:

> **10. NON-DISPARAGEMENT:** During the Term and at any time thereafter neither Executive nor Employer shall directly or indirectly, (a) make any statement, whether in commercial or noncommercial speech, disparaging or criticizing in any way the other party, or any products or services offered by Employer, nor (b) knowingly engage in any other conduct or make any other statement that is likely to impair the goodwill or reputation of the other party.

(*Id.* § 10).

Second, section 8.09 of the APA provides that Cardinal will be the

> featured platform for [EPIC's] health plan reinsurance and stop loss division; provided, that it is understood and agreed that [EPIC] may continue its existing relationship with Blake Kirk for the marketing and sale of similar products and services in the same space and certain other existing clients of [EPIC] and its Affiliates.  Absent a business similar to the Cardinal Business being embedded in a larger acquisition, [EPIC] will not strategically target or acquire a similar business during the Earnout Period without [Cardinal's] written consent.

(APA § 8.09 (alterations added)).  Blake Kirk is one of EPIC's employees and a competitor of Cardinal.  (*See* Resp. SOF ¶ 62; Reply SOF ¶ 62).  During their negotiations, the parties addressed potential conflicts with Kirk, agreed who would take the lead on 11 overlapping prospective customers, and determined how to split revenue on those customers.  (*See* Resp. SOF ¶ 62; Reply SOF ¶ 62).  According to Plaintiffs, Kirk was the driving force behind the inclusion of the word "featured" rather than "exclusive" in section 8.09.  (*See* Resp. SOF ¶ 14).

Last, under Section 8.12 of the APA, EPIC was to provide "appropriate levels of support" to Cardinal and aid in its business development by, "among other things, providing reasonable access to the resources (business contacts, vendors, suppliers, markets, etc.) of [EPIC]."  (APA § 8.12 (alteration added)).

Other contract provisions benefit EPIC.  Importantly, the Employment Agreements are "at-will" and may be terminated "at any time for any reason[.]"  (Employment Agreements §§ 1, 5,

12.1 (alteration added)).  The APA similarly explains that the Members' employment "will be at-will."  (APA § 8.05(a)).  After the Members' third year of employment, *i.e.*, in August 2022, EPIC may reduce the Members' salaries in accordance with section 6.1 of the Employment Agreements. (*See* Employment Agreements § 6.1; SOF ¶ 29; Resp. SOF ¶ 29).

Following execution of the APA and Employment Agreements, Plaintiffs were among EPIC's top producers for 2020, and EPIC was "absolutely pleased" with their performance.  (Resp. SOF ¶ 64 (quotation marks and citation omitted); Reply SOF ¶ 64).  This success did not last.  The parties quibble over Cardinal's actual profits (*see* SOF ¶¶ 22–25; Resp. SOF ¶¶ 22–25), but one thing is certain: Cardinal did not meet the projections prepared ahead of purchase negotiations in 2018.

Plaintiffs blame COVID-19, citing the difficulty in gaining new clients in the niche managed care reinsurance space due to hospital clients being overwhelmed by the pandemic.  (*See* Resp. SOF ¶¶ 66–67).  In Plaintiffs' view, hospitals were hesitant to switch reinsurance providers until the storm passed.  (*See id.* ¶¶ 66, 68).

In October 2020, Plaintiffs submitted new projections, with Soria projecting $1.7M in fee and commission revenue for 2021 and $3M for 2022.  (*See* SOF ¶ 26).  Plaintiffs call these projections "goal[s,]" not "revise[d]" projections.  (Resp. SOF ¶ 26 (alterations added; quotation marks and citations omitted)).  Terminology aside, Plaintiffs did not meet their "goal[s.]"  (*Id.* (alterations added; quotation marks and citations omitted); *see also* Soria Dep. 17–21; 162:22–163:9 ("1/2/21 has set us back a bit . . . .  It's not our fault, or EPIC's, just bad timing to be in a 4-year earnout arrangement. . . . This is not my first earnout arrangement and our numbers suck for now." (alterations added; quotation marks omitted))).

The parties' relationship began to degrade.  During the downward spiral, EPIC took several steps that Plaintiffs say violated their express and implied contractual rights.

First, beginning in the second half of 2021, EPIC engaged in discussions with six reinsurance professionals whose business Plaintiffs contend is similar to Cardinal's, meaning hiring these professionals would have generated internal competition.  (*See* SOF ¶ 37; Resp. SOF ¶¶ 37, 73–75; Reply SOF ¶¶ 73–75; Resp. 10).  Ultimately, EPIC did not hire these professionals.  (*See* SOF ¶ 37).  Nevertheless, Plaintiffs say this conduct violated two contract provisions: (1) section 8.09 of the APA because, by interviewing competitors, EPIC "'target[ed]'" "'a similar business'" to Cardinal (Resp. 10 (alteration added; quoting APA § 8.09)); and (2) section 10 of the Employment Agreements, because even having such conversations disparaged Plaintiffs (*see id.* 12).[5]

Plaintiffs also contend EPIC failed in its "support" obligations under section 8.12 of the APA, citing exclusion from and mishandling business opportunities, a demand that Plaintiffs achieve a 25% profitability margin, and adjusting the Members' salaries in bad faith.  (*See id.* 14–19).

Further, Plaintiffs say EPIC began excluding Plaintiffs from certain business opportunities, sometimes preferring Kirk instead.  (*See id.* 19–21).  For example, Plaintiffs cite EPIC's exclusion of Plaintiffs "from an opportunity with Summit Re, a managing general underwriter, which would have benefited Plaintiffs' business[.]"  (*Id.* 19 (alteration added; citing Resp. SOF ¶ 83)).  Instead, "EPIC offered that opportunity to" Kirk and other EPIC team-members.  (*Id.* (citing Resp. SOF ¶ 83)).  According to Plaintiffs, after Kirk was unhappy about ceding a prospective client to Plaintiffs, EPIC and Kirk concocted a "plan [] to approach [] Baker . . . and try to get him to cede

---

[5] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

[the client] back to [] Kirk." (*Id.* 20 (alterations added; citing Resp. SOF ¶ 85)).  Soria suggested Baker and Kirk take a joint approach, but when Kirk complained to EPIC's President of National Specialty Practices about having to work with Baker, the EPIC executive replied, "'Absolute BULL[] . . . . Go get the business and we'll figure it out.  Who in the hell gave [Cardinal] ALL Health Plan ownership?'"  (Resp. SOF, Composite 7 [ECF No. 65-12] 24 ("Sept. 13, 2022 Email from Davis to Kirk") (alterations added)).

Similarly, Plaintiffs posit EPIC mishandled other business opportunities by diverting opportunities to other team-members, not referring prospective business, not showing up to client pitches, and "bungl[ing]" another presentation.  (Resp. 20–21 (alteration added)).  Plaintiffs describe this as "a pattern of deliberately failing to support (and [] actively undermin[ing]) Plaintiffs."  (*Id.* 21 (alterations added)).

In January 2022, EPIC "asked" the Members to come up with a separation plan or achieve a 25% profitability margin in August 2022.  (Mot. 3 (citing SOF ¶¶ 38–39)).  Plaintiffs tell a different story, saying EPIC "demand[ed] separation within thirty [] days[,] . . . claim[ing] it had lost confidence in Plaintiffs[.]"  (Resp. 16 (alterations added; citing Resp. SOF ¶¶ 77–78)).  Plaintiffs say EPIC "gave Plaintiffs an ultimatum with two options: . . . 'a. the friendly exit with a share holding and support services and b. compression of comp to make EBITDA 25%[.]'"  (Resp. 18 (alteration added; quoting Resp. SOF, Composite 5 Part 2 [ECF No. 65-6] 85 ("Jan. 26, 2022 Email from Robinson to Kunney")); *see also* SOF ¶ 39).

The conversations were unfruitful.  (*See* SOF ¶¶ 40–41).  The parties dispute what happened next.  EPIC says that despite its continued performance under the contracts, Plaintiffs essentially "went on strike" and "refused to write any new business[;] [] instead [they] quietly directed their efforts to manufacturing legal claims against EPIC."  (Mot. 3 (alterations added;

citing SOF ¶¶ 40–43)).  Plaintiffs disagree with this characterization of events, saying Cardinal "absolutely still serviced the clients they had and continued to renew business[,]" but "EPIC placed Cardinal in a position [where it] was unable to solicit new business."  (Resp. SOF ¶ 42 (alterations adopted; other alterations added; quotation marks and citations omitted)).

In August 2022, EPIC reduced the Members' salaries.  (*See* SOF ¶ 44; Resp. SOF ¶ 44). Plaintiffs assert the reduction was unsupported by any agreement between the parties and made in bad faith.  (*See* Resp. SOF ¶ 44; *see also* Resp. 18–19).  EPIC followed with two subsequent calculations (*see* Resp. 18–19), but Plaintiffs state both were flawed and inconsistent with the parties' agreements (*see id.* 19).

Plaintiffs filed this lawsuit in September 2022, seeking damages for EPIC's alleged (1) breaches of the APA ("Count I"); (2) breaches of the implied covenant of good faith and fair dealing ("Count II"); and (3) breaches of the Employment Agreements ("Count III").  (*See generally* Am. Compl. [ECF No. 5]).  Thereafter, in January 2023, EPIC terminated the Members' employment.  (*See* SOF ¶ 46; Resp. SOF ¶ 46).  EPIC now moves for summary judgment on Counts I and II, partial summary judgment on Count III, and summary judgment on Plaintiffs' damages theories.[6]  (*See generally* Mot.).

### III.  LEGAL STANDARD

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citations omitted).  Relatedly, motions for partial summary judgment serve the purpose of "expediting trials by narrowing legal issues and establishing facts not in

---

[6] EPIC does not move for summary judgment on the Members' breach of contract claims regarding EPIC's alleged breach of section 6.1 of the Employment Agreements for reducing the Members' salaries.

CASE NO. 22-23170-CIV-ALTONAGA/Damian

controversy." *Brown v. Crawford Cnty.*, 960 F.2d 1002, 1007 n.6 (11th Cir. 1992) (citations omitted); *see also* Fed. R. Civ. P. 56(a) (permitting motions for summary judgment on a "part of each claim or defense"). "The same standard that applies to full motions for summary judgment applies to motions for partial summary judgment." *Bonds v. Hyundai Motor Co.*, No. 14-cv-330, 2019 WL 1244711, at *1 (M.D. Ala. Mar. 18, 2019).

A federal court must grant summary judgment if the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a), (c). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if the evidence could lead a reasonable jury to find for the nonmoving party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient[.]" *Anderson*, 477 U.S. at 252 (alterations added). Further, "[a] party opposing summary judgment may not rest upon the mere allegations or denials in its pleadings." *Walker v. Darby*, 911 F.2d 1573, 1576–77 (11th Cir. 1990) (alteration added).

If the movant discharges its initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation marks and footnote call number omitted). To make that showing, the non-moving party "must cite to . . . materials in the record or show that the materials cited do not establish the absence or presence of a genuine dispute." *Blackhawk Yachting, LLC v. Tognum Am., Inc.*, No. 12-14208-Civ, 2015 WL 11176299, at *2 (S.D. Fla. June 30, 2015) (alteration added; quotation marks omitted; citing Fed. R. Civ. P. 56(c)(1)).

Courts must draw all reasonable inferences in favor of the party opposing summary judgment. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000). "Summary judgment may be inappropriate even where the parties agree on the basic facts[] but disagree about the inferences that should be drawn from these facts." *Whelan v. Royal Caribbean Cruises Ltd.*, No. 12-cv-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (alteration added; citation omitted). Indeed, "[i]f reasonable minds might differ on the inferences arising from undisputed facts, then the Court should deny summary judgment" and proceed to trial. *Id.* (alteration added; citations omitted).

## IV. DISCUSSION

EPIC first focuses on Counts I and III — Plaintiff's breach of contract claims — arguing it is entitled to summary judgment because (1) it did not violate the plain language of the APA or Employment Agreements; (2) Plaintiffs acquiesced in EPIC's conduct and are thus estopped from making claims of breach of contract; and (3) Plaintiffs cannot prove damages resulting from the alleged breaches. Next, EPIC argues it is entitled to summary judgment on Count II because none of Plaintiffs' theories constitutes a breach of the duty of good faith and fair dealing. Finally, EPIC argues Plaintiffs' two primary theories of damages — the lost purchase price and reputational harm — are not sufficiently supported by evidence.

### A. Counts I and III — Breach of Contract Claims

The Court begins with EPIC's three breach of contract arguments, addressing first EPIC's plain language arguments; then its equitable defenses; and finally, damages.

1. Breaches of the APA and Employment Agreements

Under Florida law "[t]he elements of a breach of contract action are (1) a valid contract; (2) a material breach; and (3) damages." *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914

(11th Cir. 1999) (alteration added; citing *Abruzzo v. Haller,* 603 So. 2d 1338, 1340 (Fla. 1st DCA 1992)).  "The cardinal rule of contract law is that a court should strive to effectuate the intent of the parties." *Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen & Firemen Ret. Sys. of City of Detroit,* 50 F.3d 908, 919 (11th Cir. 1995) (citing *Hughes v. Pro. Ins. Corp.*, 140 So. 2d 340, 345 (Fla. 1st DCA 1962), *cert. denied*, 146 So. 2d 377 (1962)).  "When a contract term is clear and unambiguous, the best evidence of this intent is the term itself, and a court may not give such term meaning beyond that clearly expressed in the four corners of the document." *Id.* (citing *Fecteau v. Se. Bank, N.A.*, 585 So. 2d 1005, 1007 (Fla. 4th DCA 1991)).

When determining the intent of contracting parties, "contract provisions should be given their natural and most commonly understood meaning in light of the subject matter and circumstances, and the language being construed should be read in common with the other provisions of the contract." *Gibbs v. Air Can.*, 810 F.2d 1529, 1533 (11th Cir. 1987) (citations omitted).  "[C]ourts will not interpret a contract in such a way as to render provisions meaningless when there is a reasonable interpretation that does not do so." *Bethany Trace Owners' Ass'n v. Whispering Lakes I, LLC*, 155 So. 3d 1188, 1191 (Fla. 2d DCA 2014) (alteration added; citations and quotation marks omitted).  Indeed, "courts should endeavor to avoid interpretations which would contradict a contract's general purpose." *Arthur Rutenberg Corp. v. Pasin*, 506 So. 2d 33, 35 (Fla. 4th DCA 1987) (citation omitted).  To put it simply, a court must construe a contract in accordance with reason, practicality, and probability, and avoid an absurd construction. *See Siegel v. Whitaker*, 946 So. 2d 1079, 1083–84 (Fla. 5th DCA 2006).

If "the terms of the contract are ambiguous, [or] susceptible to different interpretations, parol evidence is admissible to 'explain, clarify or elucidate' the ambiguous term." *Strama v. Union Fid. Life Ins. Co.*, 793 So. 2d 1129, 1132 (Fla. 1st DCA 2001) (alteration added; quoting

CASE NO. 22-23170-CIV-ALTONAGA/Damian

*Friedman v. Va. Metal Prods. Corp.*, 56 So. 2d 515, 517 (Fla. 1952)).   Whether a contract is ambiguous is a question of law.   *See id.*   "[I]f the facts of the case are not in dispute, the court will also be able to resolve the ambiguity as a matter of law."   *Id.* (alteration added; citing *Ellenwood v. S. United Life Ins. Co.*, 373 So. 2d 392, 394 (Fla. 1st DCA 1979)).   By contrast, "[w]here the terms of the written instrument are disputed and reasonably susceptible to more than one construction, an issue of fact is presented as to the parties' intent which cannot properly be resolved by summary judgment."   *Universal Underwriters Ins. Co. v. Steve Hull Chevrolet, Inc.*, 513 So. 2d 218, 219 (Fla. 1st DCA 1987) (citation omitted); *Hibiscus Assocs. Ltd.*, 50 F.3d at 919 ("Generally, the proper construction of an ambiguous contract term is a question of fact which should be reserved to the [factfinder]." (alteration added; citing *Fecteau*, 585 So. 2d at 1007)).

> a.   *Section 8.09 of the APA*

EPIC contends it did not violate section 8.09 of the APA, which "prevented EPIC from targeting or acquiring another business like Cardinal[,]" because all EPIC did was "consider[]" individuals for employment.   (Mot. 7 (alterations added)).   According to Plaintiffs, section 8.09 "plain[ly]" "prohibits EPIC from targeting Plaintiffs' competitors, regardless of whether they are acquired[,]" and whether or not they are entities or individuals.   (Resp. 10–11 (alterations added)).   Alternatively, Plaintiffs argue section 8.09 is ambiguous and resolution of its meaning is inappropriate by summary judgment.   (*See id.* 11).   Plaintiffs are right that section 8.09 is ambiguous, precluding summary judgment.

Recall that section 8.09 states: "[a]bsent a *business* similar to the Cardinal Business being embedded in a larger acquisition, [EPIC] will not strategically target or acquire a similar *business* during the Earnout Period without [Cardinal]'s written consent."   (APA § 8.09 (alterations and emphasis added)).   EPIC's position is that, read together with "acquire[,]" "business" means more

than an individual hire.  (Mot. 7 (alteration added); *see also* Reply 4–5).  Plaintiffs say EPIC "impermissibly narrows the section's proscription by excluding the word 'target' and adding the word 'entity' after 'business.'"  (Resp. 10 (quoting APA § 8.09; citation and footnote call number omitted)).  The Court concludes the provision is reasonably susceptible to more than one construction.

Starting with the plain language of section 8.09, the definition of "business" does not resolve the issue.  "Business" means "a commercial enterprise carried on for profit" as well as "a particular occupation or employment habitually engaged in for livelihood or gain."  *Business*, BLACK'S LAW DICTIONARY (11th ed. 2019).  Given this broad definition, "business" as used in section 8.09 could easily mean an individual's business or a business entity.  EPIC notes (*see* Reply 4 n.3), that the APA defines the "Cardinal Business" as "the Business unit as operated by [Cardinal] or its designated Affiliate" as opposed to each individual Member (APA § 3.04(a) (alteration added)); while this lends some minimal support to EPIC's position, it does not conclusively decide the issue, and the phrase remains ambiguous.

EPIC argues that Plaintiffs' reading "asks th[e] Court to ignore the words 'acquire/acquisition' (which only apply to purchasing a business)."  (Reply 4 (alteration added)).  EPIC's argument relies on a faulty premise.  "Acquire" means "[t]o gain possession or control of; to get or obtain."  *Acquire*, BLACK'S LAW DICTIONARY (11th ed. 2019) (alteration added).  It includes, but is not limited to, purchasing something.  Certainly, it could include hiring an employee.  For example, a company could "acquire a new healthcare reinsurance professional."  Likewise, "target" means "to make a target of," *e.g.*, "targeted her for promotion[.]"  *Target*, MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/target (last visited Nov. 21,

2023) (alteration added).  In short, "target" and "acquire" could apply to both a business entity and an individual.

Plaintiffs insist that "EPIC's interpretation of section 8.09 would render it virtually meaningless[,]" giving EPIC the ability to "target and acquire Cardinal's competitors so long as they were not entities, shrinking the market of prospective customers . . . and adding internal competition, something Cardinal and EPIC sought to avoid."  (Resp. 11 (alterations added; footnote call number omitted; citing Resp. SOF ¶ 62)).  EPIC insists that purchasing a competing company could cast doubt on whether Cardinal was the "featured" platform, but individual hires would not.  (Reply 5 (quotation marks omitted; quoting APA § 8.09)).

Reading section 8.09 as a whole suggests EPIC is wrong.  Just before the prohibition on targeting or acquiring a business, the agreement states Cardinal will be the featured platform but EPIC's relationship with Blake Kirk — an individual — could continue.  (*See* APA § 8.09).  In other words, the provision itself contemplates and addresses internal competition *by an individual*; indeed, the parties carved out an exception for a specific, competing individual.

Read together "in light of the subject matter and circumstances, . . . and . . . in common with the other provisions of the contract[,]" section 8.09 is not facially clear, and all parties offer reasonable constructions of it.  *Gibbs*, 810 F.2d at 1533 (alterations added; citations omitted).  The plain language could easily suggest a broad reading or a narrow one, and either of those readings makes sense in the context of the entire agreement.  On the one hand, the parties could have decided individual hires were unlikely to present a serious issue, especially considering EPIC employed at least one individual competitor — Blake Kirk — so the provision was only supposed to cover the narrower meaning of targeting or acquiring a business *entity*.  On the other hand, it could be that the parties supposed *any* additional internal competition could undermine Cardinal (especially

given Kirk's presence), so they intended to bar EPIC from targeting or acquiring both individuals and entities in the same line of business as Cardinal.

"As both interpretations provide reasonable constructions, the phrase is clearly ambiguous." *Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1246 (11th Cir. 2002) (citation omitted). Because "the terms of the [APA] are disputed and reasonably susceptible to more than one construction, an issue of fact is presented as to the parties' intent which cannot properly be resolved by summary judgment." *Universal Underwriters Ins. Co.*, 513 So. 2d at 219 (alteration added; citation omitted). Thus, the proper construction of section 8.09 is reserved to the factfinder following a trial. *See Hibiscus Assocs. Ltd*, 50 F.3d at 919.

> *b. Section 10 of the Employment Agreements*

EPIC also seeks partial summary judgment on section 10 of the Employment Agreements, which bars it from "knowingly engag[ing] in any other conduct . . . that is likely to impair the goodwill or reputation of the other party." (Employment Agreements § 10 (alterations added)). EPIC argues there is no evidence it "ever disparaged Plaintiffs" "when speaking with other reinsurance professionals" or that it "knew its mere conversations . . . would in any way harm Plaintiffs' goodwill or reputations." (Mot. 7–8 (alteration added; citations omitted)). Plaintiffs maintain that EPIC's actions in interviewing Plaintiffs' competitors is "self-evident" of conduct EPIC knew would "likely [] impair the goodwill or reputation of the [] Members." (Resp. 12 (alterations added)). EPIC insists the argument and evidence put forth by Plaintiffs on this issue is "not enough to overcome summary judgment." (Reply 5 (citation omitted)). The Court disagrees.

As EPIC surely knows, the Court must draw all reasonable inferences and factual disputes in Plaintiffs' favor. *See Chapman*, 229 F.3d at 1023. Where a reasonable factfinder may "draw

more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton*, 883 F.2d 923, 933–34 (11th Cir. 1989) (citation omitted).  Viewed in the light most favorable to Plaintiffs, one can reasonably infer that by interviewing Plaintiffs' competitors, EPIC suggested to those candidates that the Members' performance was not up to par and thereby disparaged or criticized the Members in violation of section 10.

    2.  <u>Waiver and Estoppel</u>

EPIC next argues that Plaintiffs are barred from claiming EPIC breached section 8.09 of the APA or section 10 of the Employment Agreements because they "s[a]t silent [and] participate[d] in the conduct they now complain of," all while "accept[ing] their generous salaries[.]" (Mot. 8 (alterations added; citations omitted)).

The Court first addresses the threshold issue of what doctrines are at issue.  Besides a vague reference to Plaintiffs being "estopped" from bringing their claims, EPIC's Motion lacks clear reference to what legal or equitable doctrine it relies on.  (*Id.* 8–9).  Plaintiffs presume EPIC is invoking the defense of equitable estoppel (*see* Resp. 12–13), but the cases EPIC cites appear to address waiver, not estoppel (*see* Mot. (citing *Acosta v. Dist. Bd. of Trs. of Miami-Dade Comm. Coll.*, 905 So. 2d 226, 229 (Fla. 3d DCA 2005); *Pretka v. Kolter City Plaza II Inc.*, 09-80706-Civ, 2013 WL 1192378, at *5 (S.D. Fla. Mar. 22, 2013), *aff'd*, 550 F. App'x 830 (11th Cir. 2013))).  In its Reply, EPIC clarifies that it relies on the doctrines of "acquiescence, ratification, waiver, and estoppel[.]"  (Reply 6 (alteration added)).

EPIC may not raise new defenses in its Reply when it could have but did not raise and flesh out the same defenses in its Motion.  *See Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we repeatedly have admonished, arguments raised for the first time in a reply

brief are not properly before a reviewing court." (alteration adopted; quotation marks omitted; collecting cases)).   Nonetheless, because EPIC's Motion arguably raises arguments regarding waiver and estoppel (*see* Mot. 8–9), the Court considers the parties' positions on these doctrines.

Waiver and estoppel are both affirmative defenses.  *See* Fed. R. Civ. P. 8(c)(1).  "A district court should not grant summary judgment where genuine issues of material fact exist about an affirmative defense."  *Bryant v. Rich*, 530 F.3d 1368, 1380 (11th Cir. 2008) (citations omitted) (Wilson, J., concurring in part, dissenting in part); *see also* Fed. R. Civ. P. 56(a).  Further, "it is well established that the party asserting an affirmative defense usually has the burden of proving it."  *In re Rawson Food Serv., Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988) (alteration adopted; citation and quotation marks omitted).

"Waiver is commonly defined as the intentional or voluntary relinquishment of a known right."  *MDS (Canada) Inc. v. Rad Source Techs., Inc.*, 720 F.3d 833, 852 (11th Cir. 2013) (citing *Fireman's Fund Ins. Co. v. Vogel*, 195 So. 2d 20, 24 (Fla. 2d DCA 1967); other citation omitted).  "The essential elements of waiver are (1) the existence at the time of the waiver of a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge of the right; and (3) the intention to relinquish the right."  *Taylor v. Kenco Chem. & Mfg. Corp.*, 465 So. 2d 581, 587 (Fla. 1st DCA 1985) (citations omitted).

"Waiver may be express[] or implied from conduct or acts that lead a party to believe a right has been waived."  *Id.* (alteration added; citations omitted).  If waiver is implied from conduct, however, "the conduct relied upon to do so must make out a clear case of waiver."  *Am. Somax Ventures v. Touma*, 547 So. 2d 1266, 1268 (Fla. 4th DCA 1989) (citing *Taylor*, 465 So. 2d at 587; other citation omitted).  Under Florida law, a material breach excuses a party from performance of a contract, but a party can waive its right to complain of a breach if the party's

"deliberate acts recognized the contract as still subsisting[.]" *Id.* (alteration added; citation omitted). Importantly, "[t]here can be no waiver unless the party against whom the waiver is invoked was in possession of all the material facts." *Fireman's Fund Ins. Co.*, 195 So. 2d at 24 (alteration added; citation omitted).

EPIC does not discuss the elements of waiver but at least cites two cases in support of its arguments (*see* Mot. 8–9), which the Court addresses. *Acosta* involved a college program that sent acceptance letters with tuition estimates to admitted students, who then signed and returned the letters. *See* 905 So. 2d at 227. Before the program began, the school informed the students the program would cost more, and most accepted students still enrolled, commenced the program, paid the tuition, and graduated. *See id.* at 228. Those students sued for breach of contract, arguing the letters formed a binding contract with agreed-upon tuition. *See id.*

The appellate court affirmed the trial court's finding that no binding contract existed and added that, even assuming there was a valid contract, by "commencing the program, satisfying all their course requirements, and eventually graduating," the students "may be held to have acquiesced to the higher tuition." *Id.* at 228–29. The court explained that "'[w]here a party fails to declare a breach of contract, and continues to perform under the contract after learning of the breach, it may be deemed to have acquiesced in an alteration of the terms of the contract, thereby barring its enforcement.'" *Id.* at 229 (alteration added; quoting *New Jersey v. Gloucester Envtl. Mgmt. Servs.*, 264 F. Supp. 2d 165, 177–78 (D.N.J. 2003)).

In *Pretka*, the court, relying on *Acosta*, held that condo purchasers waived their right to rely on a builder's breach to excuse their performance under a contract when the purchasers did not object to changes in completion dates for their units, selected finishes for their units, negotiated new deposit payment schedules, and made additional deposit payments. *See* 2013 WL 1192378,

at *1–2, *5.  The "[p]laintiffs' actions . . . demonstrated that they expected [the d]efendant to perform its end of the bargain."  *Id.* at *5 (alterations added; citing *Acosta*, 905 So. 2d at 229).

Plaintiffs complain that these cases are distinguishable because "among other differences, EPIC was required to obtain Plaintiffs' written consent" before targeting other similar businesses as part of the APA.  (Resp. 13 (citation omitted)).  This argument is misplaced.  EPIC's failure to obtain Plaintiff's written consent — the breach of contract — does not foreclose Plaintiffs' ability to waive the right to complain of such breach.  To hold as much would eviscerate the concept of waiver.

Plaintiffs also insist they "absolutely objected" to EPIC interviewing the candidates (Resp. 12 (citing Resp. SOF, Composite 2 [ECF No. 65-2], Resp. Soria Dep.[7] 33:15–35:22)), but the evidence Plaintiffs cite does not squarely support that assertion.  Soria testified that he believed EPIC "should not have had those discussions with those individuals" and that "[e]very time Peter [Robinson] mentioned one of these individuals[, Soria] told him, 'Peter, we cannot afford to give up any revenue opportunities  in the Cardinal Point Unit . . . if we're going to hit our asset purchase numbers . . . .  All of these individuals are active in the managed care reinsurance space."  (Resp. Soria Dep. 33:20–22; 35:3–19 (alterations added)).  Nowhere in Soria's testimony is there any indication Soria notified EPIC that its conduct was in breach of the APA.  (*See generally id.*).

Although EPIC cites evidence that Cardinal knew at least some of the interviews took place and participated in some interviews (*see, e.g.*, SOF, Composite F [ECF No. 49-6], Robinson Dep. 98:3–24; 102:12–104:2; 184:16–185:6); the record contains evidence supporting Plaintiffs' contention that EPIC was "cryptic" about what roles the prospective hires would fill (Resp. SOF ¶ 37 (citations omitted)).  For example, Rodriguez "believe[d] . . . [Mary Sullivan] was being

---

[7] Plaintiffs and EPIC cite Soria's deposition testimony, but they include different portions of the testimony in their respective submissions.  (*Compare* Soria Dep. *with* Resp. Soria Dep.).

interviewed as a potential producer" but was "not exactly sure what space." (SOF, Composite A Rodriguez Dep. 94:3–7 (alterations added); *see also id.* 96:9–10 (explaining that "[a]t the time that they were having conversations, [Rodriguez] did not know what type of conversations they were having." (alterations added)).  When discussing "what roles" EPIC was interviewing the individuals for, Soria testified Robinson "was always very vague on a lot of topics" and "was never clear as to what the roles were." (Soria Dep. 39:10–17).  Similarly, it appears the Members were unaware of what percentages of the individuals' books of business were health plan reinsurance. (*See id.* 43:15–44:13).

At minimum, there exists a genuine dispute whether Cardinal was "in possession of all the material facts" necessary for it to waive its right to object to the interviews, thus precluding summary judgment.  *Fireman's Fund Ins. Co.*, 195 So. 2d at 24.

The related defense of equitable estoppel is applicable if the following three elements are proven by clear and convincing evidence: "(1) the party against whom estoppel is sought must have made a representation about a material fact that is contrary to a position it later asserts; (2) the party claiming estoppel must have relied on that representation; and (3) the party seeking estoppel must have changed his position to his detriment based on the representation and his reliance on it." *Watson Clinic, LLP v. Verzosa*, 816 So. 2d 832, 834 (Fla. 2d DCA 2002) (citation omitted).  According to Plaintiffs, "EPIC comes nowhere close to satisfying its burden to demonstrate estoppel by the applicable clear and convincing evidence standard," and Plaintiffs "absolutely objected to EPIC targeting their competitors." (Resp. 12 (citation omitted)).  Plaintiffs also criticize the cases EPIC cites as "bear[ing] no resemblance whatsoever to the facts in this case[.]" (*Id.* 13 (alterations added; citation omitted)).

EPIC makes no effort to establish the elements of equitable estoppel. EPIC does not clearly identify a "representation" Plaintiffs made that is now contrary to a position they have taken, nor does it show that EPIC relied on any representation or "changed [its] position to [its] detriment[.]" *Watson Clinic, LLP*, 816 So. 2d at 834 (alterations added; citation omitted). Of course, "'the onus is upon the parties'" — not the Court — "'to formulate arguments.'" *Hewlett-Packard Co. v. CP Transp. LLC*, No. 12-21258-Civ, 2012 WL 4795766, at *2 (S.D. Fla. Oct. 9, 2012) (quoting *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); alteration, footnote call number, and other citation omitted). The Court declines to sift through the record and scour the law to determine whether EPIC — the movant — is entitled to summary judgment on one of its affirmative defenses.

### 3.  Damages Element of Breach of Contract Claims

Next, EPIC argues Plaintiffs' breach of contract claims fail because Plaintiffs lack recoverable damages. (*See* Mot. 9). Plaintiffs explain that they have suffered "reputational damage" and, in any event, need not produce evidence of damages because Florida law entitles them to nominal damages if they establish a breach of contract. (Resp. 13–14). EPIC maintains that (1) the APA bars reputation damages; (2) nominal damages are unavailable to Plaintiffs; and (3) if nominal damages are available, the Court should "grant summary judgment as to all other measures of damages." (Reply 7).

To begin with, "even if a plaintiff cannot (or does not) prove any actual damages, it may be entitled to nominal damages." *Hemisphere Holdings I, LLC v. Wal-Mart Stores E., LP*, No. 15-23404-Civ, 2016 WL 7497574, at *6 (S.D. Fla. Aug. 12, 2016) (citing *Walter Int'l Prods., Inc. v. Salinas*, 650 F.3d 1402, 1418–19 (11th Cir. 2011) (discussing Florida breach of contract cases); *Stevens v. Cricket Club Condo., Inc.*, 784 So. 2d 517, 519 (Fla. 3d DCA 2001) ("Nominal damages

can be awarded when a legal wrong has been proven, but the aggrieved party has suffered no damages[.]" (alteration adopted; other alteration added; quotation marks and citation omitted)); *Muroff v. Dill*, 386 So. 2d 1281, 1284 (Fla. 4th DCA 1980) ("Nominal damages may be awarded when the breach of an agreement or invasion of a right is established, since the law infers some damage to the injured party[.]" (alteration added; citations omitted))).

EPIC nevertheless contends that nominal damages are not available "where the damages are simply nonexistent." (Reply 7 (citing *Fiddler's Creek, LLC v. Naples Lending Grp., LC*, No. 14-379-Civ, 2017 WL 11722219 (M.D. Fla. Feb. 8, 2017))). In *Fiddler's Creek, LLC*, the court held summary judgment against a plaintiff on its breach of contract claim was appropriate because the plaintiff ascribed "nonexistent or [] attenuated" damages, rendering the claim "meritless[,]" despite the plaintiff's insistence it was entitled to nominal damages. 2017 WL 11722219, at *1 (alterations added). The court distinguished the authority the plaintiff relied on as only applying where a plaintiff's damages were "uncertain or difficult to calculate" as opposed to "non-existent." *Id.* This interpretation conflicts with Florida law and binding Eleventh Circuit precedent.

"Florida law does require an award of at least nominal damages if a breach of contract has been established." *Walter Int'l Prods., Inc.*, 650 F.3d at 1418 (citing *MSM Golf, L.L.C. v. Newgent*, 853 So. 2d 1086, 1087 (Fla. 5th DCA 2003)). In *MSM Golf, L.L.C.*, for instance, the court explained that "[i]t is a fundamental principle of contract law that once liability for a contract breach is established, an injured party is entitled as a matter of right to compensatory damages." 853 So. 2d at 1087 (alteration added; citing *St. Regis Paper Co. v. Watson*, 428 So. 2d 243 (Fla. 1983); *Fisher v. Miami*, 172 So. 2d 455 (Fla. 1965)). Thus, a new trial was warranted when a jury returned a verdict finding a defendant liable for breach of contract but awarding no damages. *See id.*

Likewise, *in Onontario of Florida Inc. v. R.P. Trucking Co., Inc.*, the appellate court reversed the trial court's judgment granting a directed verdict for the defendant where the plaintiff failed to prove any actual damages on its breach of contract claim, because the plaintiff was "entitled to nominal damages once the breach of contract had been established, notwithstanding the absence of evidence regarding the correct measure of damages." 399 So. 2d 1117, 1118 (Fla. 4th DCA 1981) (citations omitted); *see also Continuum Condo. Ass'n, Inc. v. Continuum VI, Inc.*, 549 So. 2d 1125, 1127 (Fla. 3d DCA 1989) ("[N]ominal damages can be awarded when a legal wrong has been proven, but the aggrieved party has suffered no damages, . . . [or where] recoverable damages were not proven[.]" (alterations added; citations omitted)).

Presumably realizing it has taken a losing position, in its Reply, EPIC alternatively asks the Court to grant summary judgment on all damages except nominal damages, contending the APA bars the only category of damages Plaintiffs claim — reputation damages. (Reply 7). The Court declines to consider this argument, raised for the first time in EPIC's Reply. *See Herring*, 397 F.3d at 1342. Further, although reputational damages may be barred by section 7.07 of the APA for a breach of that document — which, to be clear, the Court does not determine — EPIC does not demonstrate that section 7.07 is binding on the Members for alleged breaches of the Employment Agreements. (*See generally* Mot.; Reply).

On these issues, the Court has reason to "believe[] the case would benefit from a full hearing." *United States v. Certain Real & Pers. Prop. Belonging to Hayes*, 943 F.2d 1292, 1297 (11th Cir. 1991) (alteration added; citation omitted); *see also Lind v. United Parcel Serv., Inc.*, 254 F.3d 1281, 1285 (11th Cir. 2001) ("[T]he Supreme Court has acknowledged that, even in the absence of a factual dispute, a district court has the power to deny summary judgment in a case

where there is reason to believe that the better course would be to proceed to a full trial." (alteration added; citations and quotation marks omitted)).

Summary judgment on Counts I and III is therefore denied.

### B.  Count II – Breach of the Implied Covenant of Good Faith and Fair Dealing

EPIC argues it is entitled to summary judgment on Cardinal's claim of breach of the implied covenant of good faith and fair dealing because Cardinal lacks evidence that EPIC failed to provide appropriate levels of support to Cardinal.  (*See* Mot. 10 (quoting APA § 8.12)).  The Court disagrees, with one exception.

"Under Florida law, every contract contains an implied covenant of good faith and fair dealing, requiring that the parties follow standards of good faith and fair dealing designed to protect the parties' reasonable contractual expectations." *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005) (citation omitted).  Importantly, a claim for breach of the implied covenant cannot stand alone; it "attaches to the performance of a specific contractual obligation."  *Id.* (citation omitted).  In other words, absent a breach of an express terms of an agreement, "Florida law precludes a finding of breach of the implied covenant of good faith and fair dealing." *Id.* at 1152.

To prevail on such a claim, a party "must demonstrate a failure or refusal to discharge contractual responsibilities, prompted . . . by a conscious and deliberate act, which unfairly frustrates the agreed common purpose and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement."  *Shibata v. Lim*, 133 F. Supp. 2d 1311, 1319 (M.D. Fla. 2000) (alteration added; citing *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097 (Fla. 1st DCA 1999)).  To be sure, the implied covenant "cannot be used to vary the

terms of an express contract." *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1316 (11th Cir. 1999) (quotation marks and citation omitted).

The APA obligates EPIC to "provide appropriate levels of support for the Cardinal Business consistent with the business plan and budget approved by [EPIC] on an annual basis . . . including, among other things, providing reasonable access to the resources (business contacts, vendors, suppliers, markets, etc.) of [EPIC]." (APA § 8.12 (alterations added)). EPIC posits that Cardinal's theories of breach are an improper attempt to "use the implied covenant to create 'an abstract and independent term of the contract.'" (Mot. 11 (alteration adopted; quoting *Enola Contracting Serv., Inc. v. URS Grp., Inc.*, No. 08cv2, 2008 WL 1844612, at *3 (N.D. Fla. 2008))). In its Response, Cardinal raises several theories of breach; EPIC fails to demonstrate the absence of a dispute of material fact on all but one of these theories.[8]

Cardinal first points to EPIC's "demand[ for] separation within [30] days" because it "made it impossible for Plaintiffs to solicit prospective customers without misleading them." (Resp. 16 (alterations added; citation omitted)). Explaining this further, Cardinal states, "[t]o sell new clients, brokers must build on the promise and expectation that the broker will manage the prospective client's account through at least the term of the policy, usually one year[;]" and that brokers remain involved with the client through the length of the policy by "providing claims analysis, handling claims issues, and answering any questions the client might have." (*Id.* (alterations added; citations omitted)). Thus, the Members could not "solicit prospective customers without misleading them because the Employment Agreements prohibited the []

---

[8] EPIC discusses Plaintiffs' alleged exclusion from budget meetings and argues such exclusion cannot violate the implied covenant. (*See* Mot. 15). Plaintiffs do not respond to this point (*see generally* Reply) and therefore forfeit it.

Members from informing current and prospective clients that their employment with EPIC [wa]s or [could] be ending." (*Id.* (alterations added; citation omitted)).

EPIC resists this interpretation of section 12.1, insisting it would improperly nullify EPIC's contractual right to terminate the Members at will. (*See* Reply 8). EPIC contends it "could have simply fired [the Members] and then they would no longer be able to solicit new business and would have no claim." (*Id.* (alteration added)). The Court agrees.

Although section 8.12 creates rights distinct from the parties' employment relationship, EPIC's obligation to exercise good faith ends where an express provision covering the issue begins. Put differently, if Plaintiffs' expectations are not reasonable given another aspect of the parties' agreement, their claim fails.

Plaintiffs do not dispute that the Members' employment with EPIC was at will, so Plaintiffs could *never* have told clients that their employment with EPIC would continue. Any expectation otherwise is unreasonable. Thus, EPIC's separation demand "cannot be said to be 'capricious nor in contravention of the parties' reasonable expectations' so as to violate the covenant, in light of the express provisions relating to [at-will employment]." *S&B/BIBB Hines PB 3 Joint Venture v. Progress Energy Fla., Inc.*, 365 F. App'x 202, 206 (11th Cir. 2010) (alteration added; quoting *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1292 (11th Cir. 2001)).[9] Summary judgment in favor of EPIC on this narrow issue is appropriate.

The Court turns to Plaintiffs' next theory: EPIC's "threat to impose a 25% profit margin requirement." (Resp. 18). EPIC contends it had an express contractual right to terminate the

---

[9] Moreover, Plaintiffs admit they "do not allege that the separation demand constitutes a breach of contract" (Resp. 17 (citation omitted)) — a necessary predicate to their claim, *see Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 896 So. 2d 787, 792 (Fla. 2d DCA 2005) ("There can be no cause of action for a breach of the implied covenant absent an allegation that an express term of the contract has been breached." (quotation marks and citation omitted)).

Members or reduce their salaries, but instead of doing so, proposed an alternative: "keep things in place . . . , with no reduction in salary . . . , and [create] a plan for payroll adjustments . . . that will get [Cardinal] to a 25% operating margin." (SOF, Composite A 337 (Feb. 17, 2022 email from Soria to Kunney) (alterations added)). According to EPIC, Cardinal refused; and EPIC never imposed the 25% profit margin requirement. (*See* SOF ¶ 40 (citing *id.*, Composite E [ECF No. 49-5], Kunney Dep. 120:3–121:22)).

Plaintiffs tell another tale. They say EPIC "never retracted" the profit margin requirement (Resp. 18), which, in no uncertain terms, was a message from EPIC to Cardinal saying "'you can't spend money'" (*id.* (quoting Resp. SOF ¶ 41 (citing Resp. Soria Dep. 59:12–60:17; 129:10–19))). Soria testified that meeting the margin requirement "was physically impossible [without] reduc[ing] [] expenses so substantially that it would be impossible [for the Members] to even travel to generate new business." (Resp. Soria Dep. 55:15–18 (alterations added)). The cited testimony — and conflicting accounts — create a genuine dispute of fact on whether EPIC made such a demand and whether that demand contravened Plaintiffs' reasonable expectations.

Plaintiffs also raise additional theories of EPIC's violation of the implied covenant in connection with section 8.12. They cite (1) EPIC excluding Plaintiffs from an opportunity with Summit Re, a managing general underwriter; (2) EPIC's President of National Specialty Practices encouraging Kirk to "get [] business" from Chinese Community Health Plan, a client supposedly "ceded" to Cardinal under the APA; (3) EPIC not referring Plaintiffs new business even once in three years and instead excluding Plaintiffs from brokering reinsurance for at least two new clients; and (4) disastrous handling of referral opportunities. (Resp. 19–21 (alteration added)).

EPIC responds to each of these arguments, saying (1) "Summit Re [] did not want to work with Plaintiffs[;]" (2) Plaintiffs had stopped pursuing new business months before the Chinese

CASE NO. 22-23170-CIV-ALTONAGA/Damian

Community Health Plan pitch, which never happened; (3) "EPIC steered opportunities" with two other clients to Cardinal, "[n]ever referred health plan business to anyone else[,]" and Cardinal pitched the two clients Plaintiffs reference before Cardinal joined EPIC; and (4) EPIC employees "did not respond timely" to a document request, "inadvertently missed a call[,]" and "did not perform well in client pitch, which EPIC later tried to fix." (Reply 9–13 (alterations added)).

Once again, the parties provide two versions of events, with citations to supporting evidence (*see* Resp. SOF ¶¶ 83–87 (citations omitted); Reply SOF ¶¶ 83–87 (citations omitted)), creating genuine disputes of material fact.

Finally, Plaintiffs' theory that "EPIC's initial miscalculations"[10] concerning Plaintiffs' salaries "were made intentionally, in bad faith, and in furtherance of EPIC's efforts to frustrate and thwart Plaintiffs[] from developing new business" is also not susceptible to summary judgment. (Resp. 8 (alteration added)). At minimum, Plaintiffs raise a genuine dispute of material fact on whether EPIC intentionally reduced the Members' salaries using improper calculations in a manner that contravened Cardinal's reasonable support expectations under the APA.

For these reasons, summary judgment on Count II is denied.

### C. Damages Theories — Purchase Price and Reputation Damages

Finally, EPIC takes aim at two of Plaintiffs' damages theories: the purchase price of Cardinal based on its expert's testimony, and reputation and goodwill damages based on the Members' testimony. EPIC argues that Plaintiffs' purchase price valuation "is based entirely on

---

[10] At first, EPIC reduced the Members' salaries from a collective $900,000 to $285,600. (*See* Resp. 18 (citation omitted)). Once Plaintiffs' counsel identified issues with the reduction, EPIC revised its calculations to a collective $469,131. (*See id.* 19). After additional discussions, EPIC again revised the salaries to $658,874, approximately $375,000 more than the additional reduction. (*See id.* 19). Around $37,000 remain in dispute and form the basis of the Members' breach of contract claim that EPIC does not seek summary judgment on. (*See* Mot. 6 n.2).

CASE NO. 22-23170-CIV-ALTONAGA/Damian

Plaintiffs' speculation" and the reputation damages lack "any acceptable methodology or support."
(Mot. 18).  The Court addresses each category of damages in turn.

      1.  <u>Purchase Price</u>

      Plaintiffs seek purchase price damages of $7.114 million, largely based on their expert,
Michael Seelhof's damages analysis.  (*See* Resp. 21–24; *see generally* Resp. SOF, Ex. 8, Expert
Report of Michael Seelhof [ECF No. 65-13] ("Seelhof Report")).  EPIC likens the purchase price
damages to lost profits damages and deems the figure too speculative, stating it would require
massive performance improvements and profitability increases.  (*See* Mot. 15–18; Reply 10–11).
In EPIC's view, because Plaintiffs cannot prove EPIC caused Plaintiffs' damages or Plaintiffs have
no reasonable standard by which to measure them, summary judgment in favor of EPIC on this
damages theory is appropriate.  (*See* Mot. 17).

      "It is settled under Florida law that lost profit damages, like all damages, cannot be
speculative and must be proved with reasonable certainty."  *Nebula Glass Int'l, Inc. v. Reichhold,
Inc.*, 454 F.3d 1203, 1213 (11th Cir. 2006) (citing *W.W. Gay Mech. Contractor, Inc. v. Wharfside
Two, Ltd.*, 545 So. 2d 1348, 1350–51 (Fla. 1989); *Twyman v. Roell*, 166 So. 215, 218 (Fla. 1936)).
Because "proving lost profits invariably includes some element of prediction about how the market
would have behaved but for the defendant's tortious act or breach, Florida courts have often noted
that proving lost profits damages is difficult, but by no means impossible."  *Id.* (collecting cases).
The "uncertainty" that often precludes recovery of lost profits damages is "the cause of the damage
rather than the amount."  *W.W. Gay Mech. Contractor, Inc.*, 545 So. 2d at 1350 (quotation marks
and citations omitted).

      Generally, "anticipated profits of a commercial business are too speculative and dependent
upon changing circumstances to warrant a judgment for their loss."  *Levitt-ANSCA Towne Park*

*P'ship v. Smith & Co., Inc.*, 873 So. 2d 392, 396 (Fla. 4th DCA 2004) (quotation marks and citations omitted).  This is especially true in cases involving "new and untried enterprises"; the "justifiable doubt" of such ventures requires "more specific evidence of their probable profits . . . than when the claim is for harm to an established business."  Restatement (Second) of Torts § 912 cmt. d (1979) (alteration added).  Florida nevertheless allows a new or unestablished business "to prove lost future business even without a 'track record.'" *Air Caledonie Intern. v. AAR Parts Trading, Inc.*, 315 F. Supp. 2d 1319, 1343 (S.D. Fla. 2004).  "If there is a 'yardstick' by which prospective profits can be measured, [lost profits damages] will be allowed if proven." *W.W. Gay Mech. Contractor, Inc.*, 545 So. 2d at 1351 (alteration added; citations omitted).  In short, "the [plaintiff] must prove both (1) that the defendant's action caused the damage, and (2) that there is some standard by which the amount of damages may be adequately determined." *Air Caledonie Intern.*, 315 F. Supp. 2d at 1343 (alteration added; citing *W.W. Gay Mech. Contractor, Inc.*, 545 So. 2d at 1351).

EPIC contends that "Plaintiffs' claims are based on speculation and conjecture" because Cardinal: (1) "had no prior history of acting as an insurance broker"; (2) "consistently operated at a loss every year[,] . . . and its revenues remained stagnate [sic] or declined"; (3) "demonstrated . . . an inability to make accurate projections or to achieve them"; (4) "admits . . . it has no underlying support for its new projections, and it cannot name one of its hypothetical new customers"; (5) "admits it has no contracts, communications, or other evidence that it would obtain any of its unknown customers"; and (6) "does not even know which customers were buying 2023 coverage." (Mot. 17 (alterations added; citations omitted)).

Plaintiffs insist their damages are not speculative because they are based on the Seelhof Report, and EPIC's arguments are "misplaced" in that they "ignore[] Plaintiffs' stellar pre-COVID

performance . . . and [] consistent historical performance prior to joining EPIC[,]" as well as the elimination of COVID-related challenges by early 2022. (Resp. 21–22 (alterations added; citations omitted)). Plaintiffs also deem their inability to name specific prospective customers irrelevant because they "operate in a niche market where there is a consistent demand from health plans for reinsurance and stop loss policies." (*Id.* 22). Perfunctorily, Plaintiffs conclude their expert "establish[es] Plaintiffs' purchase price damages with a reasonable degree of certainty." (Resp. 23 (alteration added)). Although this is a close case, the Court agrees with Plaintiffs that their damages claim is supported by sufficient evidence to survive summary judgment.

To start, this case is not one where future profits are based on "the randomness of an individual company's whim." *Nebula Glass Int'l, Inc.*, 454 F.3d at 1216 (discussing *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1175–76 (11th Cir. 2002) (holding lost profits were too speculative where future earnings were dependent on a company deciding whether to sell its Florida properties)). Instead, the purchase price is based on, among other things, market trends and Plaintiffs' prior performance. (*See generally* Seelhof Report). The Florida Supreme Court found the issue of lost profits presented a jury question where the record contained "competent and substantial evidence" of causation "supported by studies prepared by reputable economic analysts" that "provide[] a sufficient standard to support the experts' testimony concerning lost profits." *W.W. Gay Mech. Contractor, Inc.*, 545 So. 2d at 1351 (alteration added).

A review of the evidence Plaintiffs submit shows this case meets the threshold imposed by *W.W. Gay.*[11] Plaintiffs performed well over their history in the reinsurance and stop loss industry

___

[11] Some cases EPIC cites are inapt because the only evidence of lost profits was wholly unsubstantiated lay testimony. (*See* Mot. 17–18 (citing *Pier 1 Cruise Experts v. Revelex Corp.*, 929 F.3d 1334, 1342–43 (11th Cir. 2019) (lay testimony regarding damages based on a number pulled "out of thin air" was insufficient to establish lost profits with reasonable certainty (quotation marks omitted)); *Marc E. Bosem MD PA v. Sentinel Ins. Co., Ltd.*, No. 20-62205-Civ, 2022 WL 467008, at *4–5 (S.D. Fla. Jan. 21, 2022) (comingled documentary evidence of a plaintiff's profit, loss, sales, and tax information was insufficient to establish

before joining EPIC (Resp. SOF ¶¶ 54, 58, 60); performed well at EPIC prior to COVID-19 (*see id.* ¶¶ 57, 70); and COVID-19 impacted their performance prior to the measurement period (*see id.* ¶¶ 65–66). They also testify that the detriments posed by the pandemic eased prior to the calculation period (*see id.* ¶ 68), but EPIC's alleged breaches impacted Plaintiffs' ability to solicit new business[12] (*see supra* Sections IV.A through IV.B).

Seelhof takes a three-step approach to calculating the purchase price in the "Counterfactual Scenario[,]" *i.e.,* but-for EPIC's breaches. (Seelhof Report 7–8 (alteration added)). He "estimat[es] the total market size accessible to [Cardinal] based on detailed reinsurance relationship data from CapIQ[13]"; "forecast[s] [Cardinal's] future business volume (number of client relationships and total premiums brokered) and financial performance (commissions received and operating expenses) based on the total market accessible to [Cardinal] and Plaintiffs' past performance"; and lastly, "comput[es] the Purchase Price based on [Cardinal's] projected financial performance during the Final Measurement Period and the Purchase Price Formula[.]" (*Id.* 24 (alterations added)).

To reach his estimates, Seelhof makes several calculations based on assumptions at least arguably supported by the record. He "assume[s]" that Cardinal would have (1) "maintained its status as [Broker of Record ("BOR")] throughout the forecasting period; (2) "become BOR for

---

lost profits "without speculation or conjecture" (quotation marks and citation omitted)); other citations omitted). Here, by contrast, Plaintiffs' purchase price is premised on Plaintiffs' own history in the industry and reasoned expert testimony.

[12] To be clear, there is also evidence that Plaintiffs refused to even try to get new business as the parties' relationship became more strained, and that COVID-19 did not impact other EPIC reinsurance business. (*See* SOF ¶¶ 40–43). These disputed facts certainly affect causation but create genuine disputes of material fact for resolution at trial.

[13] CapIQ is a database that sources data from the National Association for Insurance Commissioners and includes granular data on past reinsurance policies between health plans and reinsurance companies.

five additional past direct clients out of a remaining total of nine with active policies in 2022, as reported by CapIQ"; (3) "become BOR for 10 of [] 43 remaining core relationships"; (4) "targeted a sub-group of 83 clients with ceded premiums of between $300 thousand and $10 million 2022" and "become BOR 10 of those 83 clients"; (5) "added most clients [] during the first 12 months of its client acquisition efforts"; (6) added half as many clients [] during the second 12 months than in the first 12 months"; and (7) added "half as many new clients [] during the third 12 months than in the second 12 months. (*Id.* 27–28 (alterations added)). Although it is not totally clear how Seelhof arrives at these assumptions, Plaintiffs' prior business averaged 22 health plan and stop loss clients per year, never dropping below 18 new clients per year, which Seelhof notes elsewhere. (*See id.* 32, Fig. 9).

Courts repeatedly approve of lost profits where experts extrapolate future performance from past performance data. *See, e.g.*, *Nebula Glass Int'l, Inc.*, 454 F.3d at 1216–17. True, Plaintiffs experienced bad years during the pandemic that Seelhof does not appear to average into his calculations. (*See generally* Seelhof Report). And "[p]rojecting future profits based on the continuation of a substantial existing trend is far different from projecting profits that contradict an existing trend." *Nebula Glass Int'l, Inc.*, 454 F.3d at 1217 n.2 (alteration added); *see also Brevard Cnty. Fair Ass'n, Inc. v. Cocoa Expo, Inc.*, 832 So. 2d 147, 153 (Fla. 5th DCA 2002) (rejecting jury verdict awarding lost profits because "the evidence showed that the [plaintiff] had not earned profits for a reasonable time before the dispute, and as such, lost profits were not established by a reasonable degree of certainty" (alteration added)).

Nonetheless, it is not clear Seelhof's projections contradict an existing trend. Plaintiffs experienced several profitable years prior to the pandemic performing very similar type of work and covering the same types of clients and insurance (*see* Seelhof Report 32, Fig. 9); all parties

agree Plaintiffs were performing well before COVID-19 was in full swing (Resp. SOF ¶ 64; Reply SOF ¶ 64). Further still, Plaintiffs' testimony supports the reasonable inference that Plaintiffs' performance would improve once the effects of the pandemic ebbed. (*See* Resp. SOF, Composite 1 [ECF No. 65-1], Rodriguez Dep. 108:1–9 ("We were positioned to capitalize on the fourth year of the APA . . . . We had a formula, we were confident on some significant numbers on the activity that we had[.]" (alterations added)); *see also id.*, Composite 4 [ECF No. 65-4], Baker Dep. 115:18– 120:3 (explaining why Plaintiffs were confident in their success in 2023 based on the end of COVID, current relationships, and legwork done over the pandemic)).

In sum, Plaintiffs' testimony, coupled with Seelhof's analysis, preclude summary judgment on this issue. Plaintiffs submit evidence of their successful performance over many years in an extremely similar business, that the detrimental effects of COVID-19 would subside during the measurement period, and that EPIC's alleged breaches prevented them from soliciting new business. Seelhof supports this theory by providing a sufficient yardstick by which to measure the purchase price, using economic analysis and relying on assumptions supported by the record. *See W.W. Gay Mech. Contractor, Inc.*, 545 So. 2d at 1351.

The Court emphasizes, again, that the case presents a close call; Plaintiffs may very well fail to overcome the many disputed facts at trial. In any event, especially given that this will be a bench trial, the Court has reason to "believe[] the case would benefit from a full hearing" on these issues. *Certain Real & Pers. Prop. Belonging to Hayes*, 943 F.2d at 1297 (alteration added).

   2.   Reputation Damages

EPIC also contends Plaintiffs' reputational damages are unsupported by competent evidence beyond Plaintiffs' conclusory testimony, lacking concrete examples and ignoring certain

facts, such as that Knopp retired. (*See* Mot. 18–19). Plaintiffs, of course, disagree, and argue the Members' testimony is sufficient to prove damage to their reputations. (*See* Resp. 24–25).

To start, two of the cases EPIC cites on this issue stand for the unremarkable proposition that complex financial calculations often require expert testimony. (*See* Mot. 18 (citing *Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1222 (11th Cir. 2010) (affirming trial court's exclusion of evidence related to undisclosed category of damages and noting that "calculating the good will of a business and harm to that goodwill . . . will often involve complex financial calculations[.]" (alterations added; citation omitted)); *Rosenberg v. DVI Receivables, XIV, LLC*, 12-cv-22275, 2012 WL 5198341, at *5 (S.D. Fla. Oct. 19, 2012) (citing *Mee Industries* and stating that computation of a *corporation*'s loss of goodwill requires expert testimony); other citations omitted)).

Plaintiffs explain that they need not provide expert testimony for individual reputation and goodwill damages, and the methodology they put forth is their estimate of "what it costs to build their reputations multiplied by the number of years it will take to rebuild them[,]" using expenses from operating their prior business and while at EPIC. (Resp. 25 (alteration added; citation omitted)). Plaintiffs therefore contend the sufficiency of their evidence presents a triable issue of fact.

The Court agrees with Plaintiffs and finds persuasive *ADT LLC v. Alarm Protection LLC*, No. 15-cv-80073, 2017 WL 2212541, at *8–9 (S.D. Fla. May 17, 2017), which Plaintiffs cite (*see* Resp. 24–25). The *ADT* court examined the same authority cited by the parties here and held no expert testimony was necessary for an individual to seek damages to his or her reputation or goodwill. *See ADT LLC*, 2017 WL 2212541, at *8–9. The court approved of a methodology (like that which Plaintiffs rely on here) based on "'a plaintiff's expenditures in building its reputation

in order to estimate the harm to its reputation after a defendant's bad acts.'" *Id.* at \*9 (quoting *Skydive Az., Inc. v. Quattrocchi*, 673 F.3d 1105, 1112 (9th Cir. 2012)).

EPIC entirely fails to address *ADT LLC* or its reasoning (*see generally* Reply), attacking only Plaintiffs' reliance on "historical expenses of two different entities operating at different times" without "consider[ing] the future revenues of that entity" (*id.* 11 (alteration added)). The Court is not convinced that these criticisms compel summary judgment for EPIC. As in *ADT LLC*, "[i]n the event Defendants seek to argue that Plaintiffs' evidence at trial is insufficient to support goodwill or reputation damages . . . ., Defendants may bring the issue before the Court. This is not, however, a matter for summary judgment." 2017 WL 2212541, at \*9 (alterations added).

## V.  CONCLUSION

Indeed, not much of anything briefed by the parties is "a matter for summary judgment." *Id.* Accordingly, it is

**ORDERED AND ADJUDGED** that Defendants, EPIC Holdings, Inc. and Edgewood Partners Insurance Center, Inc.'s Motion for Partial Summary Judgment **[ECF No. 48]** is **GRANTED in part** and **DENIED in part**.

**DONE AND ORDERED** in Miami, Florida, this 11th day of December, 2023.

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:      counsel of record