UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-23170-CIV-ALTONAGA

CARDINAL POINT, LLC; *et al.*,

      Plaintiffs,

v.

EDGEWOOD PARTNERS
INSURANCE CENTER, INC.; *et al.*,

      Defendants.

_____/

## ORDER SETTING FORTH FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** came before the Court for a non-jury trial beginning March 4, 2024. The Court has carefully considered the testimony of the witnesses, the exhibits admitted in evidence, the parties' written submissions, and applicable law. Based on its review of the record and pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court makes the following findings of fact and conclusions of law.

## I. INTRODUCTION

This case is about a failed business relationship between Plaintiffs, Cardinal Point, LLC ("Cardinal"), Alex Soria, Tony Rodriguez, Kenneth Knopp, and Randy Baker (the "Cardinal Members"); and Defendants, Edgewood Partners Insurance Center, Inc. and its parent company, EPIC Holdings, Inc. (in most instances referred to collectively as "EPIC"), following EPIC's 2019 acquisition of Cardinal, a Florida limited liability company that sold healthcare-related reinsurance policies.

Plaintiffs filed this suit in September 2022.  In Count I of their Amended Complaint [ECF No. 5], Plaintiffs allege EPIC breached an Asset Purchase Agreement (the "APA")[1] entered with Cardinal; and in Count II, they allege EPIC breached the APA's implied covenant of good faith and fair dealing.  In Count III, Plaintiffs allege EPIC breached Employment Agreements[2] entered with the Cardinal Members concurrent with the APA.  Upon review, the Court finds EPIC did not breach the APA, although it breached the Employment Agreements, and the Cardinal Members are entitled to damages.  The Court awards the Cardinal Members nominal and compensatory damages totaling $1,035.86 to Soria; $848.25 to Rodriguez; and $753.44 each to Knopp and Baker.

The Court will enter a separate money judgment in favor of Plaintiffs and against Edgewood Partners, dismiss the claims against EPIC Holdings, and reserve jurisdiction to address requests for costs and attorney's fees.

## II.  FINDINGS OF FACT

1.      EPIC Holdings is a Delaware corporation with its principal place of business in Delaware.  EPIC Holdings is a national retail insurance brokerage and consulting firm.  Edgewood Partners is EPIC Holdings' subsidiary and is a California corporation with its principal place of business in California.  Edgewood Partners is registered to do business in Florida and has an office in Miami-Dade County, Florida.  Edgewood Partners is a non-operational, pass-through entity that makes certain acquisitions and hires employees.  Functionally, Edgewood Partners is inseparable from EPIC Holdings.

2.      Cardinal is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.  The Cardinal Members own 100 percent of the membership

---

[1] Of the two related Defendants, EPIC Holdings is the entity that signed the APA.

[2] Edgewood Partners is the entity that signed the Employment Agreements.

interests of Cardinal.  Soria and Rodriguez reside in and are citizens of Florida.  Knopp resides in and is a citizen of Tennessee.  Baker resides in and is a citizen of Colorado.

3.      The Cardinal Members operated a managing general underwriter business known as RBS, which sold health maintenance organization ("HMO") reinsurance and stop loss policies. In 2006, HM Life Insurance Company ("HM Life") purchased RBS for an upfront payment of approximately $10 million and a five-year earnout arrangement.  At the time of HM Life's purchase, RBS had a book of business and was profitable.

4.      In 2012, the Cardinal Members formed Cardinal and entered a mutually exclusive arrangement with HM Life, whereby Cardinal served as the sole distributor of HM Life's HMO reinsurance product.  Any customer who wanted HM Life products had to buy through Cardinal. Cardinal sold HM Life products directly to health plans and providers and through brokers.

5.      In December 2015, HM Life gave Cardinal notice that it was terminating Cardinal's exclusive arrangement, and Cardinal could not write new business for a two-year period, from January 2, 2018, through some time in 2019.  Consequently, Cardinal experienced a downward trend in revenue and EBITDA[3] each year since 2017, as well as a downward trend in customers after 2015.

6.      In 2018, Cardinal began negotiating the sale of its operations to Integro USA, a national retail insurance broker like EPIC.  The proposed transaction contemplated that Cardinal would operate as a broker.

---

[3] EBITDA stands for earnings before interest, taxes, depreciation, and amortization, and is used to measure profitability.  *See* Adam Hayes, *EBITDA: Definition, Calculation Formulas, History, and Criticisms*, INVESTOPEDIA (Jan. 28, 2024), https://www.investopedia.com/terms/e/ebitda.asp.

7.      Cardinal had never operated as an insurance broker — representing the customer, rather than the insurance carrier — and the Cardinal Members had never competed with other brokers selling the same insurance policies.

8.      In 2019, EPIC acquired Integro and continued negotiations with Cardinal.

9.      In late 2018, Soria, Cardinal's President, created projections for Cardinal's performance as a broker from 2019 through 2022.  Soria represented Cardinal would obtain 12 customers in the first 12 months and 25 to 30 customers over three years.  Soria's projections showed substantial year over year revenue and profit growth for Cardinal:

|  | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|
| Revenue | $1,495,710 | $2,354,274 | $3,626,267 | $5,035,750 |
| Profit (Loss) | ($123,205) | $310,477 | $1,033,661 | $2,173,302 |
| EBITDA Percentage | -8% | 13% | 29% | 43% |

10.      Undisclosed to EPIC, Soria's projections were based largely on his "experience." Soria did not seek the input of Cardinal's primary salespeople when preparing the projections. EPIC relied on Soria's projections in negotiating the Cardinal transaction.

11.      EPIC supplied the initial draft of the APA.  The parties — represented by counsel — exchanged multiple drafts of the Indication of Interest, the APA, and Employment Agreements. The final versions of the APA and Employment Agreements were executed on August 16, 2019.

12.      In the parties' final Indication of Interest for the transaction, EPIC agreed to purchase Cardinal for its "profitable top line revenue growth."

13.      The APA stated the Cardinal purchase price was based on future performance under an earnout formula measured in the fourth year after closing, with a minimum threshold of $2.5 million in revenue and EBITDA above 20 percent.  EBITDA was the driving factor of the purchase price.

14.     The Cardinal purchase price was allocated entirely to intangible assets such as goodwill, as Cardinal contributed no hard assets or existing revenue streams.  Cardinal's existing business stayed with HM Life, and Cardinal was starting from zero as a first-time broker.  The purchase price formula aligned the parties' interests: the more Cardinal produced, the more money EPIC and Cardinal would make.

15.     Under section 8.09 of the APA, the parties agreed that Cardinal would be EPIC's "featured platform" for health plan reinsurance and stop loss products.  EPIC rejected a prior version of the APA that designated Cardinal as the "exclusive platform" for health plan reinsurance and stop loss products because EPIC does not enter exclusivity arrangements.

16.     Soria knew Cardinal would not be EPIC's exclusive platform.  EPIC already employed other specialty brokers, including Blake Kirk, who overlapped with Cardinal's market. EPIC nonetheless agreed it would not target or acquire a competing "business" unless it was part of a larger acquisition.[4]

17.     In section 8.12 of the APA, EPIC agreed to provide Cardinal support and resources consistent with EPIC's budgets.[5]

---

[4] Section 8.09 provides:

> **Section 8.09    Cardinal Business as the Health Plan Reinsurance Platform**.
> Purchaser intends to utilize the Cardinal Business as the featured platform for its health plan reinsurance and stop loss division; provided, that it is understood and agreed that Purchaser may continue its existing relationship with Blake Kirk for the marketing and sale of similar products and services in the same space and certain other existing clients of Purchaser and its Affiliates.  Absent a business similar to the Cardinal Business being embedded in a larger acquisition, Purchaser will not strategically target or acquire a similar business during the Earnout Period without Seller's written consent.

[5] Section 8.12 states:

> **Section 8.12    Development of Cardinal Business**.  During the Earnout Period, Purchaser will provide appropriate levels of support for the Cardinal Business consistent with the business plan and budget approved by Purchaser on an annual basis and in

18.     Under Section 8.05 of the APA and sections 5 and 12 of the Employment Agreements, the Cardinal Members were employed "at-will" and could be terminated "at any time for any reason."

19.     The Cardinal Members knew they could be terminated at any time, including during the earnout period.  Defendants insisted on the protection of at-will employment provisions in case the Cardinal Members did not perform as anticipated.  The Cardinal Members negotiated and received the protection of a severance benefit — the difference between three years' salary and what they were paid through the termination date — if terminated without cause.

20.     Section 10 of the Employment Agreements prevented the parties, during the Term and any time thereafter, from directly or indirectly (a) making any statement, whether in commercial or noncommercial speech, disparaging or criticizing in any way the other party, or any products or services offered by the Employer; or (b) knowingly engaging in any other conduct or making any other statement that was likely to impair the goodwill or reputation of the other party.

21.     While the Cardinal Members' annual salaries totaled $900,000,[6] the parties agreed that EPIC would have the right to reduce the Members' salaries so that compensation would not exceed 75 percent of revenue in months 12 through 24, and 65 percent in months 24 through 36.[7]

---

coordination with Purchaser's overall strategy as to the Integro Re/EPIC Re division, including, among other things, providing reasonable access to the resources (business contacts, vendors, suppliers, markets, etc.) of Purchaser.

[6] Soria's annual salary was $275,000.00; Rodriguez's was $225,000.00; and Knopp's and Baker's salaries were each $200,000.00.

[7] Section 6.1 reads:

**6.1 Annual Compensation**. Subject to adjustment as set forth herein, for the first forty-eight-month (48) period commencing on the effective date of this Agreement, Employer shall pay to Executive annual cash compensation equal to a [Base Salary]. If the compensation paid to Executive and the other employees comprising the Cardinal Unit during the first thirty-six month (36) month period commencing on the effective date of

22.     Given industry purchasing practices, over 80 percent of Cardinal's business was determined as of January 1 each year, when customers purchased annual policies.  As of January 1, 2020, Cardinal secured seven customers for $1.2 million in revenue to EPIC.

23.     Although Soria had projected a modest profit of $310,477.00 for the year, Cardinal's first-year performance resulted in EPIC sustaining a $400,000.00 loss.

24.     Cardinal was unable to generate and retain business, and it did not perform profitably after joining EPIC.

25.     The COVID-19 pandemic began in March 2020, after approximately 80 percent of Cardinal's annual revenue was known.  Cardinal blames the pandemic, citing its impact on health plans' hesitation to switch brokers.  Yet, similar production teams at EPIC remained profitable and continued to generate new business.  For example, Kirk exceeded the revenue of Cardinal's four producers each year.  Similarly, Peter Robinson's EPIC Re team exceeded Cardinal's revenues,

---

this Agreement exceeds that certain percentage of the annualized Revenue (as defined in the Asset Purchase Agreement among EPIC Holdings Inc. and Cardinal Point, LLC and its members) of the Cardinal Unit set forth in the table below, then the Base Salary along with the compensation of such other Cardinal Unit employees shall be reduced proportionately.

*Months 12 through 24 Maximum compensation to Revenue ratio of 75%*
*Months 24 through 36 Maximum compensation to Revenue ratio of 65%*

After 48 months an annual bonus plan shall be developed in consideration of Executive's contribution to the Cardinal Unit's business unit meeting and exceeding the profit margin and revenue growth expectations reasonably set for the Cardinal Point business unit each year.  The Base Salary shall be payable in accordance with Employer's customary payroll practices and procedures and, as with all compensation payable under this Agreement, less withholdings for State and Federal income tax, FICA, FUTA, and other required statutory deductions.  All compensation shall be prorated for any partial period during a calendar year, provided that to be eligible for the annual bonus Executive must be employed by Employer as of the Employer's regular bonus payment date each year.

generated more new business than Cardinal, and increased its profitability from 20 percent to 35 percent.[8]

26.     While Cardinal claims health plans were hesitant to switch brokers during the pandemic, Cardinal lost four clients to other brokers between 2020 and January 2023.

27.     In October 2020, EPIC asked Soria for revised revenue projections.  This time, Soria projected $1.7 million in fee and commission revenue for 2021 and $3 million for 2022.

28.     Soria admitted Cardinal's numbers were poor and that it was not EPIC's fault.

29.     In 2021, Cardinal's revenue remained stagnant at $1.2 million, again missing Cardinal's original projections — this time by $2.4 million, and missing Cardinal's post-COVID revised projections by $500,000.00.  This resulted in EPIC sustaining another annual loss of $480,000.00.  Again, Soria acknowledged Cardinal's numbers "sucked."

30.     In October 2021, during budget season, EPIC met with Cardinal to discuss its performance and potential salary reductions.  Although salary reductions were discussed, no salary reductions or other measures were imposed.  Rather, EPIC waited to see whether, by January 1, 2022, Cardinal's performance would improve.

31.     As of January 1, 2022, Cardinal's business dropped to approximately $1.1 million. With around 80 percent of its business for the year determined, Cardinal was $1.9 million below its post-COVID revised projections and more than $3.9 million below its original projections. Cardinal's revenues resulted in another annual loss to EPIC of $515,000.00.

32.     EPIC met with Cardinal in January 2022 to discuss alternatives to EPIC enforcing its right to terminate the Cardinal Members' at-will employment or reduce salaries.  As part of this alternative proposal, EPIC asked the Cardinal Members to come up with a separation plan.

---

[8] Kirk and Robinson had established relationships with existing clients, pre-COVID, while Cardinal had been at EPIC far less time when the pandemic started.

33.     In February 2022, EPIC proposed that as an alternative to separating or reducing salaries as allowed by the APA and Employment Agreements, Cardinal suggest a plan to reach a 25 percent profit margin in August.  The Cardinal Members refused to come up with a separation plan or offer an alternative proposal.

34.     After these unsuccessful conversations, EPIC did not require Cardinal to reach a 25 percent profit margin.  EPIC also did not terminate the Cardinal Members' at-will employment or reduce their salaries.  Instead, EPIC continued to support Cardinal's expenditures and did not refuse requests to assist Cardinal with business development.

35.     In February 2022, Cardinal told EPIC that due to the parties' conversations, Cardinal would not write new business, thereby exacerbating the revenue shortfall.

36.     A possible opportunity for EPIC and Cardinal to collaborate with a healthcare reinsurance broker, Summit Re, materialized in April 2022.  EPIC and Cardinal representatives attended a meeting with Summit Re.  Although EPIC encouraged all parties to work together, Summit Re did not want to collaborate with Cardinal on business opportunities.

37.     In September 2022, Kirk sought to pursue new business from Chinese Community Health Plan, one of Cardinal's clients, and did not want to work with Cardinal, or anyone else, on the prospect.  The proposed pitch did not occur.

38.     During the four-year earnout period, EPIC had conversations with several reinsurance professionals.  The conversations began in mid-2021.

39.     EPIC did not hire any of these individuals.  Cardinal knew of these conversations and was aware the individuals were being considered as potential hires and that their business could overlap with Cardinal's.

40.     Cardinal never objected to EPIC's conversations with the reinsurance professionals.  Soria only told Cardinal he did not want to give up prospects in the health plan space if anyone was hired.

41.     On August 4, 2022, EPIC advised the Cardinal Members it would be reducing their salaries in accordance with section 6.1 of the Employment Agreements and provided a breakdown of its planned salary reduction calculations.

42.     The Cardinal Members disputed EPIC's calculations, and EPIC twice revised its salary reduction calculations.  On September 12, 2022, EPIC reduced the Cardinal Members' base salaries retroactive to August 14, 2022.

43.     The Cardinal Members insisted the salary reduction calculations were incorrect because EPIC improperly included salary paid to a non-employee and co-producer commission expenses.

44.     Cardinal and the Cardinal Members filed suit in September 2022.

45.     EPIC terminated the Cardinal Members in January 2023.  At that point, Cardinal was within the earn-out period and, as with January 1 of each year, more than 80 percent of its business was determined.  Cardinal projected its own 2023 revenue at $1.1 million and admitted there was no new business.  It was apparent that Cardinal could not hit the minimum $2.5 million revenue and greater than 20 percent EBITDA thresholds under the APA.

46.     By January 2023, EPIC had lost nearly $1.4 million on the Cardinal transaction, and Plaintiffs had received over $3.6 million in combined salaries and benefits.

47.     There were business opportunities Plaintiffs failed to close, and EPIC made mistakes in handling development of these opportunities.  As to one, Medical Mutual, Robinson

missed a phone call.  Regarding another, Group Health, an EPIC employee performed poorly in a client pitch, resulting in the client declining to switch brokers.

48.     After the Cardinal Members were terminated, clients asked Robinson why Cardinal was no longer with EPIC.  Robinson responded that Cardinal and the Cardinal Members could not make the transition from underwriters to brokers.

49.     Cardinal claims it would have retained its existing 2022 business revenue and added nine new customers during the measurement period, to obtain a $7.144 million purchase price.  But it has not identified one prospective client it would have obtained during the earnout period.

50.     Cardinal has no contracts, communications, or other evidence showing it would secure any clients; nor does it even know if any of its supposed prospective clients was buying 2023 coverage.  Cardinal does not address whether it would even retain its existing clients (after having lost multiple key clients over three years), even though brokers generally expect to lose clients every year for a multitude of reasons.

51.     Plaintiffs performed no analysis to support any claim for reputational damages.  Plaintiffs did not retain an expert on this issue and conducted no market analysis.  Plaintiffs also claim entitlement to three years of operating expenses without adequately explaining what revenue a new business might obtain.

### III.  CONCLUSIONS OF LAW

#### A.     **Subject Matter Jurisdiction**

The Court has subject matter jurisdiction under 28 U.S.C. section 1332.  Plaintiffs seek the recovery of damages exceeding $75,000, exclusive of interest, costs, and attorney's fees.  Plaintiffs are citizens of Florida, Tennessee, and Colorado. Defendants are citizens of Delaware and California.

### B.    Claims and Defenses

As stated, in Count I of the Amended Complaint, Cardinal alleges breach of section 8.09 of the APA based on EPIC's employment discussions with reinsurance professionals.  In Count II, Cardinal states a claim of breach of the implied covenant of good faith and fair dealing based on section 8.12 of the APA, citing several examples of EPIC's conduct that Cardinal maintains were in derogation of EPIC's "support" obligations under the APA.  In Count III, the Cardinal Members allege breaches of sections 6.1 and 10 of the Employment Agreements, asserting EPIC miscalculated the salary reductions and disparaged the Members.  Plaintiffs seek three categories of damages: Cardinal seeks $7.114 million in purchase price damages for the alleged breaches of the APA and implied covenant of good faith and fair dealing; and the Cardinal Members seek $4,971,825.00 in reputation damages for alleged disparagement and $37,745.00 for salary reduction miscalculations under the Employment Agreements.

Defendants raise a number of defenses.  According to Defendants, Plaintiffs' claims are barred or limited under the doctrines of acquiescence, waiver, estoppel, ratification, laches, and unclean hands; because of Plaintiffs' prior breaches or failure to substantially perform; because Plaintiffs' own conduct hindered, prevented, or made impossible EPIC's performance; and because of Plaintiffs' failure to mitigate damages.

The claims, claimed damages, and defenses are addressed below.

### C.    Breach of Contract (Counts I and III)

To succeed on their breach-of-contract claims, Plaintiffs must prove: (a) the existence of a contract; (b) a material breach; and (c) damages.  *See Dixon v. Univ. of Miami*, 75 F.4th 1204, 1208 (11th Cir. 2023) (citations omitted).  The APA and Employment Agreements are valid and binding contracts.

CASE NO. 22-23170-CIV-ALTONAGA

       1.    *Section 8.09 of the APA (Count I)*

Plaintiffs claim that EPIC breached section 8.09 of the APA by targeting competitors which were not embedded units of larger acquisitions with business like Cardinal's business.

In construing the APA, the Court is required to give all terms their plain meaning and cannot rewrite the parties' agreement. *See Fla. Recycling Servs., Inc. v. Greater Orlando Auto Auction, Inc.*, 898 So. 2d 129, 131 (Fla. 5th DCA 2005) ("If the provisions of a contract are unambiguous, courts may not violate the clear meaning of the words in order to create an ambiguity, and certainly may not rewrite the contract. If possible, courts should give effect to each provision of a written instrument in order to implement the true meaning of the document." (citation omitted)); *Dows v. Nike, Inc.*, 846 So. 2d 595, 601 (Fla. 4th DCA 2003) ("Where the terms are unambiguous, the parties' intent must be discerned from the four corners of the document." (citations omitted)). The Court can resort to parol evidence only if it first finds the agreement ambiguous. *See Silver v. Countrywide Home Loans, Inc.*, 760 F. Supp. 2d 1330, 1342 (S.D. Fla. 2011) (noting that "parol evidence cannot be admitted to create an ambiguity where none otherwise exists." (citation omitted)).

Although section 8.09 of the APA states that Cardinal would be EPIC's "featured platform" for health plan reinsurance and stop loss products, it does not provide exclusivity. Plaintiffs readily admit EPIC never featured anyone over them in the health plan market.

Section 8.09 also provides that, absent a business like Cardinal's being embedded in a larger acquisition, EPIC will not strategically target or acquire a similar business during the earnout period without Cardinal's written consent. Section 3.04 (a) defines "Cardinal Business" as the entire Cardinal unit, not each individual.

CASE NO. 22-23170-CIV-ALTONAGA

Nonetheless, for the reasons articulated in the December 11, 2023 Order [ECF No. 75], the Court finds that the use of "business" in section 8.09 is ambiguous as to whether it encompasses the hiring of individuals.  The Court thus turns to parol evidence to resolve the ambiguity.[9]

The trial evidence clarifies that the provision only prevented EPIC from targeting or acquiring a business *entity* like Cardinal, as opposed to hiring individuals who compete with Cardinal.  The parties' concern during their pre-contract negotiations was only with EPIC acquiring an entire division like Cardinal, not making individual hires.  Further, there is no provision in the APA that prevents EPIC from discussing potential employment with individual reinsurance professionals.  While targeting or purchasing a business entity like Cardinal could cast doubt on whether Cardinal was EPIC's "featured" platform, there is no evidence that an individual hire would (or ever did) have that effect.

At bottom, there is no evidence EPIC ever targeted or sought to acquire another "business" like Cardinal or "featured" any group over Cardinal.  Rather, EPIC merely discussed potential employment with several individual reinsurance professionals whose customers *may* have overlapped with Cardinal to some extent.  The discussions with individual reinsurance professionals did not breach Section 8.09 of the APA.

2. *Section 10 of the Employment Agreements (Count III)*

The Cardinal Members claim EPIC violated section 10 of the Employment Agreements, which, as stated, prohibits the parties from directly or indirectly making any statement disparaging

---

[9] To the extent Plaintiffs suggest any ambiguity should be construed against EPIC as the drafter of the APA, that rule of construction is inapplicable here, where the contract was negotiated between sophisticated parties.  *See Sch. Bd. of Broward Cnty. v. Great Am. Ins. Co.*, 807 So. 2d 750, 752 (Fla. 4th DCA 2002) (explaining that the "rule has no application" where sophisticated parties negotiate the contract).  Further, the rule is one of "last resort" and "should not be utilized if the parties' intent can otherwise be conclusively determined."  *Emerald Pointe Prop. Owners' Ass'n, Inc. v. Comm. Constr. Indus., Inc.*, 978 So. 2d 873, 878, n.1 (Fla. 4th DCA 2008) (quotation marks and citations omitted).

or criticizing the other party and knowingly engaging in any conduct or making a statement that is likely to impair the goodwill or reputation of the other party. Plaintiffs claim that EPIC's conversations with other reinsurance professionals and Robinson's statements that Plaintiffs could not make the transition from underwriters to brokers breached section 10.

The Employment Agreements do not define "disparagement," but in Black's Law Dictionary, "disparagement" is defined as "[a]ny statement cast in a negative light" regardless of its truthfulness, including an "injurious statement that discredits or detracts from the reputation of another's character, property, product, or business." *Disparagement*, BLACK'S LAW DICTIONARY (11th ed. 2019) (alteration added).

It does not appear that EPIC disparaged Plaintiffs when speaking with other reinsurance professionals. Although the conversations could feasibly be construed to discredit the Cardinal Members' reputations, the Court declines to infer that mere employment conversations are sufficient to cast a negative light on the Cardinal Members. Further, there is no evidence that EPIC knew its conversations with other insurance professionals would harm Plaintiffs' goodwill or reputations. Instead, EPIC was interested in staffing its reinsurance division and maintained open employment communications with potential hires.

As to Robinson's comments after Plaintiffs' termination and post-suit that Plaintiffs could not make the transition from underwriters to brokers, Plaintiffs first raised this theory of breach in their summary judgment briefing. EPIC contends that Plaintiffs should not be able to assert this new theory of breach of contract. Admittedly, a party may not amend a complaint with new claims presented in summary judgment papers. *Corey Airport Servs., Inc. v. Decosta*, 587 F.3d 1280, 1282 n.2 (11th Cir. 2009). Federal Rule of Civil Procedure 15(b) provides, however, that "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be

treated in all respects as if raised by the pleadings." *Id.* (alteration added).  Implied consent arises when a party fails "to object to evidence raising issues outside of the pleadings . . . as long as the evidence is not relevant to issues already within the pleadings."  *United States ex rel. Seminole Sheet Metal Co. v. SCI, Inc.*, 828 F.2d 671, 677 (11th Cir. 1987) (alteration added; citation omitted).

Here, the evidence regarding Robinson's comments was not relevant to any issue in the Amended Complaint, as it did not "ha[ve] any tendency to make a fact more or less probable than it would be without the evidence[.]"  Fed. R. Evid. 401(a) (alterations added).  Moreover, EPIC was aware for many months that Plaintiffs intended to raise this theory and had ample time to prepare to respond to the issue before trial.  Thus, EPIC suffered no prejudice from Plaintiffs injecting this issue into the case.  *See SCI, Inc.*, 828 F.2d at 677.

Robinson's comments constituted a breach of section 10 of the Employment Agreements. Robinson's statements that Plaintiffs could not make the transition from underwriters to brokers undoubtedly detracted from the Cardinal Members' reputations as brokers and thus were disparaging.

### 3.    *Section 6.1 of the Employment Agreements (Count III)*

The Cardinal Members also claim EPIC breached the Employment Agreements by reducing their salaries $37,745.00 more than allowed under Section 6.1.

According to the Cardinal Members, their annual salaries, after the reductions, should have been $696,619.00; but the reduced annual salaries totaled $658,874.00, a difference of $37,745.00, annually.  Problematically, the Cardinal Members' claim for $37,745.00 is based on the Cardinal Members' dispute with the *annual* reduction of their collective salaries.  EPIC implemented the reduced salaries on August 16, 2022, and the Cardinal Members were terminated on January 14,

2023.  Thus, the Cardinal Members' salaries were only reduced for 5 months.  This limits the Cardinal Members' collective claim to approximately $15,725.00.

The Court agrees with Plaintiffs that EPIC improperly reduced the Cardinal Members' salaries.  The Employment Agreements state that if the compensation paid to the applicable Member and the other employees comprising the Cardinal Unit exceeds that certain percentage of the annualized Revenue of the Cardinal Unit, then the Member's Base Salary along with the compensation of such other Cardinal Unit employees shall be reduced proportionally.  EPIC admitted that it improperly included a non-Cardinal employee in the calculation.  Further, the contractual language does not support EPIC's position that co-producer commissions should be included in compensation paid to the applicable Member and the other employees comprising the Cardinal Unit.  EPIC's calculations therefore shorted Soria by $4,804.86; Rodriguez by $3,931.25; and Knopp and Baker each by $3,494.44.

But the evidence also shows that EPIC overpaid Soria by $3,770.00, Rodriguez by $3,084.00, and Knopp and Baker each by $2,742.00 by including payroll taxes in its calculation — a point Plaintiffs did not rebut at trial.  Thus, including this setoff, Soria is only entitled to an additional $1,034.86; Rodriguez is entitled to $847.25; and Knopp and Baker are each entitled to $752.44.

### D.      Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II)

Plaintiffs claim EPIC breached the implied covenant of good faith and fair dealing by failing to provide them with adequate support, as required by Section 12.1 of the APA.  They point to EPIC (1) requesting that Plaintiffs suggest a separation plan in January 2022; (2) asking that Plaintiffs create a plan, at their discretion, to get Cardinal to a 25 percent operating margin, only

to later impose salary reductions; (3) excluding Plaintiffs from budget planning for 2022; and (4) engaging in other activity constituting bad faith.

To prevail on a claim of breach of the implied covenant, a plaintiff must prove "a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence; but, rather by a conscious and deliberate act, which unfairly frustrates the agreed common purpose and disappoints the reasonable expectations of the other party[.]" *Shibata v. Lim*, 133 F. Supp. 2d 1311, 1319 (M.D. Fla. 2000) (alteration added; citation omitted).  While the implied covenant may act as a gap-filling default rule where a party has discretion to make decisions without defined standards, "the limit placed on a party's discretion is not great . . . [Indeed,] '[u]nless no reasonable party would have made the same discretionary decision, it seems unlikely that the party's decision would violate the covenant of good faith[.]'" *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1291 (11th Cir. 2001) (alterations adopted; other alterations added) (quoting *Sepe v. City of Safety Harbor*, 761 So. 2d 1182, 1185 (Fla. 2d DCA 2000)).  "A breach of the implied covenant of good faith and fair dealing is not an independent cause of action, but attaches to the performance of a specific contractual obligation." *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005) (citation omitted); *see also Burger King Corp. v. Weaver*, 169 F.3d 1310, 1316 (11th Cir. 1999) ("[A]n action for breach of the implied covenant of good faith cannot be maintained [under Florida law] in the absence of breach of an express contract provision." (alterations added; citation omitted)).  Moreover, the implied covenant cannot be used to create "an abstract and independent term of [the] contract." *Enola Contracting Servs., Inc. v. URS Group, Inc.*, No. 08-cv-2, 2008 WL 1844612, at *3 (N.D. Fla. 2008) (alteration added; quotation marks and citation omitted).

Plaintiffs insist EPIC's request that they suggest a separation plan breached the implied covenant of good faith and fair dealing inherent in EPIC's support obligations under section 12.1 of the APA.  Not so.

As of January 2022, Cardinal had failed to achieve its original and post-COVID revised projections every year, instead operating at a substantial loss.  Further, to reach the minimum thresholds under the APA in 2023, Cardinal would have had to suddenly experience over 127 percent in year-over-year revenue growth and adjust its EBITDA from -45.4 percent to greater than 20 percent — that is, raise it by 65.4 percentage points.  Based on Cardinal's performance, the APA and the Employment Agreements allowed EPIC to terminate the Cardinal Members' at-will employment or impose salary reductions.  EPIC also could have allowed the APA run out and enforced Cardinal's non-compete and non-solicitation commitments.

Instead, EPIC asked Plaintiffs to suggest a separation plan, including the possibility of Plaintiffs reacquiring their business.  EPIC's proposal was an extracontractual option that might benefit all parties.  When Plaintiffs rejected that proposal, EPIC assured Plaintiffs it would honor the APA; as the parties' deteriorating relationship continued, EPIC approved Cardinal's expenses.

EPIC's request that Plaintiffs present a separation plan was not made in bad faith, nor was it "capricious []or in contravention of the parties' reasonable expectations." *Ernie Haire Ford, Inc.*, 260 F.3d at 1292 (alteration added).  Certainly, there is no evidence that EPIC engaged in a "conscious and deliberate act" to frustrate the agreed purpose of the APA, *Shibata*, 133 F. Supp. 2d at 1319; or that under the circumstances, "no reasonable party . . . would have made the same discretionary decision[,]" *Ernie Haire Ford, Inc.*, 260 F.3d at 1291 (second alteration added; quotation marks and citation omitted).

Plaintiffs could have had no reasonable expectation of remaining employed by EPIC during the earnout period given their poor financial performance.  The parties' negotiations show EPIC specifically negotiated for at-will employment that could be terminated at any time, for any reason. *See Oakes Farms Food & Distrib. Servs., LLC v. Sch. Dist. of Lee Cnty.*, 541 F. Supp. 3d 1334, 1350 (M.D. Fla. 2021) ("[T]he implied covenant of good faith and fair dealing 'cannot be used to vary the terms of an express contract.'" (alteration added; citation omitted)). Plaintiffs — sophisticated parties who sold a prior business for over $10 million — were aware of these provisions and represented by competent counsel throughout the negotiation process.  As a result, Plaintiffs negotiated for — and received — severance protection.

The specific sections of the APA and Employment Agreements dealing with the term and termination of Plaintiffs' employment also control over the general support provision in Section 12.1 of the APA, which references only matters such as access to resources.  *See Applestein v. Hartford Fire Ins. Co.*, No. 09-22494-Civ, 2010 WL 11506018, at *3 (S.D. Fla. Feb. 25, 2010) ("[I]t is a general principle of contract interpretation that a specific provision dealing with a particular subject will control over a different provision dealing only generally with that same subject." (alteration in original; quoting *Kel Homes, LLC v. Burris*, 933 So. 2d 699, 703 (Fla. 2d DCA 2006)).

To hold otherwise — that is, that Section 12.1 of the APA prevented EPIC from discussing separation with the Cardinal Members — would eviscerate EPIC's right to terminate its at-will employees at any time, for any or no reason at all.  *See S&B/BIBB Hines PB 3 Joint Venture v. Progress Energy Fla., Inc.*, 365 F. App'x 202, 205 (11th Cir. 2010) (affirming dismissal where plaintiff's asserted contract interpretation "would nullify, not harmonize, multiple contract provisions").  Again, EPIC could have simply fired Plaintiffs in January 2022. *See Ross v. Twenty-*

CASE NO. 22-23170-CIV-ALTONAGA

*Four Collection, Inc.*, 617 So. 2d 428, 428 (Fla. 3d DCA 1993) (per curiam) ("No action may be maintained for the breach of an employment contract terminable at will." (collecting cases)).

Under these circumstances, conversations about the possibility of a more favorable or different separation plan does not support a finding of EPIC's breach of the implied covenant of good faith and fair dealing.

2.    *EPIC's 25 Percent Operating Margin Request and Salary Reductions*

Plaintiffs also assert EPIC's proposal that Cardinal achieve a 25 percent operating margin and salary reductions violated the implied covenant, based on section 12.1 of the APA. Here again, Plaintiffs fail to persuade.

In January and February 2022, EPIC had the right to terminate the Cardinal Members or reduce their salaries. Rather than doing so, EPIC proposed an alternative. As discussed, the Cardinal Members refused EPIC's proposal, and EPIC never implemented a 25 percent profit margin requirement. Instead, EPIC confirmed it would honor the parties' agreements and pay Cardinal's expenses. Yet, Plaintiffs unilaterally stopped pursuing new business. Months later, in August 2022, EPIC informed Plaintiffs that it would impose salary reductions under the Employment Agreements.

On these facts, the Court does not find that EPIC's actions were taken in bad faith, that there was a conscious or deliberate act to frustrate the APA's agreed purpose, or that no reasonable party would have made the same discretionary decisions. Instead, based on Cardinal's poor financial performance, EPIC consulted with Plaintiffs to come up with ways to make all parties profitable. After Cardinal refused and decided not to pursue new business, EPIC exercised its contractual rights under Section 6.1 of the Employments Agreements to reduce the Members'

salaries.[10]  *See Enola Contracting Servs., Inc.*, 2008 WL 1844612 at *3 ("When, however, the propriety of the conduct is resolved by the express terms of the contract, no gap-filler is needed and the covenant [of good faith and fair dealing] does not apply." (alteration added; citations omitted)).

### 3.    *Cardinal's Exclusion from 2022 Budgeting*

Plaintiffs also claim that EPIC violated the covenant of good faith by excluding them from 2022 budget planning meetings.  Critically, no provision of the APA requires EPIC to include the Cardinal Members in such meetings.  The APA requires only that EPIC provide Cardinal with support consistent with EPIC's own budgets, including by providing reasonable resources.  *See Centurion Air Cargo, Inc.*, 420 F.3d at 1152 ("This court has held that a claim for a breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law in the absence of a breach of an express term of a contract." (collecting cases)).  Further, there is insufficient evidence that Plaintiffs had a reasonable expectation of being included in budgetary meetings or that their exclusion from such meetings was capricious or done in bad faith.  *See Ernie Haire Ford, Inc.*, 260 F.3d at 1291–92.  Finally, there is no evidence that in being excluded from budgetary meetings, Plaintiffs were denied any support or resources.  *See Centurion Air Cargo, Inc.*, 420 F.3d at 1152.

### 4.    *Plaintiffs' Additional Claimed Breaches*

Plaintiffs also assert that various other acts support a finding that EPIC breached the implied duty of good faith and fair dealing.

---

[10] Plaintiffs assert — without any evidence — that EPIC's calculations of the reductions were done in bad faith.  In any event, the miscalculations also form the basis of Plaintiffs' $37,745.00 claim for breach of the Employment Agreements.  *See Shibata*, 133 F. Supp. 2d at 1319 ("[A] party can maintain a claim for breach of the implied duty only if it is based on allegations different than those underlying the accompanying breach of contract claim." (alteration added)).

Plaintiffs argue that EPIC improperly excluded them from an opportunity to sell Summit Re insurance policies.  But Summit Re did not want to work with Plaintiffs; EPIC encouraged all parties to work together and did not stop Plaintiffs from working with Summit Re.

Plaintiffs assert that EPIC failed to protect Plaintiffs from Summit Re poaching Plaintiffs' business.  It is unclear what EPIC could have done differently.  Summit Re beat Cardinal's proposal by 20 percent, causing the loss of a prospective client.  There is insufficient evidence that EPIC could have somehow prevented this from occurring.

Next, Plaintiffs insist that Kirk improperly sought to pursue new business from Chinese Community Health Plan.  Kirk's proposed pitch ultimately did not occur.

Plaintiffs argue they never received referrals from EPIC, and clients were diverted.  But EPIC steered opportunities to Cardinal.  As to any diverted clients, there is insufficient evidence that EPIC diverted any clients from Plaintiffs or referred clients to anyone else.

Finally, Plaintiffs complain that EPIC failed to support Cardinal in pursuing potential business opportunities over a two-and-a-half-year period.  In this regard, Robinson failed to join a call with Medical Mutual, and EPIC bungled a client pitch.  These events appear to be the result of negligence rather than deliberate acts.

### E.     Plaintiffs' Damages Evidence

Plaintiffs seek two primary types of damages: (1) payment of the purchase price under the APA, based on Plaintiffs' claim that they could not only meet the minimum thresholds in the APA but greatly exceed them; and (2) damages to reputation and goodwill, based on prospective operating expenses of an unknown entity and without any consideration of revenues.   Assuming Cardinal had proved a breach of the APA or implied covenant of good faith and fair dealing (it did not), its purchase price damages measure is too speculative and unsupported by evidence.  The

Cardinal Members' goodwill and reputation damages evidence is similarly deficient.   The Court explains.

### 1.   The requested "purchase price" damages are too speculative.

Cardinal's demand of a $7.144 million purchase price, as presented in its expert's opinion at trial, requires the Court to conclude that absent EPIC's actions, Cardinal would have experienced an unprecedented improvement in sales.   To meet such a purchase price, Cardinal would need to increase its sales by 287 percent and increase its profits by 110 percentage points.

"Under Florida law, the general rule is that the anticipated profits of a business are too speculative and dependent on changing circumstances to warrant a judgment for their loss." *Marc E. Bosem MD PA v. Sentinel Ins. Co., Ltd.*, No. 20-62205-Civ, 2022 WL 467008, at *4 (S.D. Fla. Jan. 21, 2022) (citation omitted).   To obtain this disfavored relief, a plaintiff must prove such damages with a "reasonable degree of certainty."   *N. Palm Motors, LLC v. Gen. Motors LLC*, No. 19-cv-80872, 2022 WL 326442, at *4 (S.D. Fla. Feb. 3, 2022) (quotation marks and citation omitted).   It is even "more difficult to prove lost profits for 'an enterprise venturing into a new industry or method[.]'"   *Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1340 (S.D. Fla. 2006) (alteration added; citation omitted).   "If the terms conjecture and surmise too grandly describe the plaintiff's lost profits claim, the cases are legion that none can be recovered."   *Pier 1 Cruise Experts v. Revelex Corp.*, 929 F.3d 1334, 1342 (11th Cir. 2019) (quotation marks and citation omitted).

Cardinal's claim is too speculative and conjectural.   First, Cardinal had no prior history of acting as an insurance broker and moved into "a new industry or method" with the EPIC transaction.   *Alphamed Pharms. Corp.*, 432 F. Supp. 2d at 1340 (quotation marks and citation omitted).   Moreover, Cardinal consistently operated at a loss every year, and its revenues remained

stagnant or declined.  Whether this was due to the pandemic, Cardinal's poor performance or inexperience, or some other factor, Cardinal did not come close to reaching any of its projections, each of which proved inaccurate.

Cardinal cannot name a hypothetical new customer it would obtain and presented no contracts, communications, or other evidence that it would secure any of its unnamed customers. In fact, Cardinal does not even know which customers were buying 2023 coverage.

The Court declines to credit the testimony of Plaintiffs' expert witness.  His opinions were based solely on Cardinal's historical performance as an exclusive distributor for HM Life and largely ignored Cardinal's poor performance at EPIC.  *See Forest's Mens Shop v. Schmidt*, 536 So. 2d 334, 336–37 (Fla. 4th DCA 1988) (reversing lost profits award where expert, and trial court, ignored prior two years of losses).

Even assuming Cardinal had proved EPIC's breaches, Cardinal has not sufficiently shown — as it must — that EPIC caused Cardinal's damages and there is a reliable standard by which to determine them.  *See Pier 1 Cruise Experts*, 929 F.3d at 1342; *SMS Audio, LLC v. Belson*, No. 16-cv-81308, 2017 WL 11631378, at *2 (S.D. Fla. Apr. 25, 2017) (refusing to grant lost profits based on uncertainty of causation where the plaintiffs' financial difficulties preceded the defendants' wrongful actions).  In sum, the Court finds Cardinal's claimed damages are too speculative for recovery.  *See, e.g., Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1180 (11th Cir. 2002) (rejecting lost profits where it was speculative that employee would make sales at the right time); *Marc E. Bosem MD PA*, 2022 WL 467008, at *4; *N. Palm Motors, LLC*, 2022 WL 326442, at *8; *Pier 1 Cruise Experts*, 929 F.3d at 1340–42 (finding "it was too speculative for [a

witness] to pick a number out of thin air and determine that sales would double" (alteration added; quotation marks omitted)).[11]

> ### 2. *Plaintiffs have no acceptable methodology or support for reputation damages.*

In addition to lost profits, Plaintiffs seek damages for injury caused to Cardinal's reputation and goodwill. According to Plaintiffs, it will take three years for them to rebuild their reputations; they calculate their damages using annual historical operating costs multiplied by the number of years necessary to rebuild their reputations.

To recover such damages, Plaintiffs need to "do more than simply provide evidence of stigma" and should provide "concrete examples of lost business and damage[.]". *Rosenberg v. DVI Receivables, XIV, LLC*, No. 12-cv-22275, 2012 WL 5198341, at *4 (S.D. Fla. Oct. 19, 2012) (alteration added; quotation marks and citation omitted). A loss-of-goodwill claim serves to "compensate[] for harm to the value of the business . . . and involves complex financial calculations[,]" often requiring expert testimony. *Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1222 (11th Cir. 2010) (alterations added).

Plaintiffs' claimed damages are once again too speculative, as they are premised on an unreliable methodology — if the damages calculations presented at trial can be called a "methodology" at all. *See Agric. Servs. Ass'n, Inc. v. Ferry-Morse Seed Co., Inc.*, 551 F.2d 1057, 1072 (6th Cir. 1977) (explaining that the "plaintiff must present data from which the amount of probable loss could be ascertained as a matter of reasonable inference" and that "[t]o set a

---

[11] The Court rejects Plaintiffs' reliance on cases assessing lost profits for defective products with established sales histories, which deal with fundamentally different underlying facts from those appearing here. *See, e.g.*, *W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd.*, 545 So. 2d 1348, 1351 (Fla. 1989); *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1213–18 (11th Cir. 2006); *HGI Assocs. v. Wetmore Printing. Co.*, 427 F.3d 867, 877–81 (11th Cir. 2005); *Royal Typewriter Co. v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1105–06 (11th Cir. 1983).

quantifiable damage figure arbitrarily is impermissible [because i]t would not be a reasonable inference but would be pure guesswork" (alterations added; quotation marks and citation omitted)). The Cardinal Members base their reputational damage claim on their own conclusory testimony that they were harmed in the marketplace (without any concrete examples of *how* they were harmed) and calculations of three years of prospective operating expenses for a hypothetical new business without any consideration of revenue. Plaintiffs fail to sufficiently explain how operating expenses are connected to Plaintiffs' supposed harm or furnish any other evidence on this issue.

Nonetheless, and for the reasons explained in the December 11, 2023 Order, the Court rejects EPIC's contention that nominal damages are not available to Plaintiffs. "Florida law does require an award of at least nominal damages if a breach of contract has been established." *Walter Int'l Prods., Inc. v. Salinas*, 650 F.3d 1402, 1418 (11th Cir. 2011) (citing *MSM Golf, L.L.C. v. Newgent*, 853 So. 2d 1086, 1087 (Fla. 5th DCA 2003) (explaining that "[i]t is a fundamental principle of contract law that once liability for a contract breach is established, an injured party is entitled as a matter of right to compensatory damages" (alteration added; citations omitted))). The Court thus awards the Cardinal Members $1.00 each in nominal damages.

### F.    EPIC's Affirmative Defenses

EPIC asserts several affirmative defenses that provide alternative grounds to enter judgment in favor of Defendants and against Plaintiffs; or, alternatively, that do not bar Plaintiffs from prevailing on their breach-of-Employment-Agreement claim.

#### 1.    *Acquiescence, Waiver, Estoppel, Ratification, and Laches*

Defendants assert that Plaintiffs' claims for breaches of section 8.09 of the APA and section 10 of the Employment Agreements are barred by the doctrines of waiver, acquiescence,

ratification, estoppel, and laches.  The Court begins with the applicable legal standards and then considers the evidence.

Under Florida law, "a party may waive any rights to which he or she is legally entitled, by actions or conduct warranting an inference that a known right has been relinquished." *Hammond v. DSY Devs., LLC*, 951 So. 2d 985, 988 (Fla. 3d DCA 2007) (alteration adopted; quotation marks and citation omitted).  Waiver exists where there is (1) "a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge of the right; and (3) the intention to relinquish the right." *Laboss Transp. Servs., Inc. v. Glob. Liberty Ins. Co. of N.Y.*, 208 F. Supp. 3d 1268, 1279 (S.D. Fla. 2016) (quotation marks and citation omitted).  "Although waiver does not arise from forbearance for a reasonable time, it may be inferred from conduct or acts putting one off his guard and leading him to believe that a right has been waived[.]" *Arbogast v. Bryan*, 393 So. 2d 606, 608 (Fla. 4th DCA 1981) (alteration added; citation omitted) (holding that a party's failure to timely speak out and enforce a claim to commissions due from a transaction constituted waiver).

"In other words, 'where a party fails to declare a breach of contract[] and continues to perform under the contract after learning of the breach, it may be deemed to have acquiesced in an alteration of the terms of the contract, thereby barring its enforcement.'"  *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1181 (11th Cir. 2010) (alteration adopted; other alteration added; quoting *Acosta v. Dist. Bd. of Trs. of Miami-Dade Cmty. Coll.*, 905 So. 2d 226, 228–29 (Fla. 3d DCA 2005) (holding that medical students claiming breach of contract by university for tuition increases acquiesced, "through their conduct . . . [of] commencing the program, satisfying all their course requirements, and eventually graduating, . . . [in paying] the higher tuition" (alterations added))).

Ratification exists where "a party knows of the wrongful conduct at issue, does not reject it, and takes any material act inconsistent with an intent to avoid it or delays in asserting any remedial rights[.]" *Citron v. Wachovia Mortg. Corp.*, 922 F. Supp. 2d 1309, 1321 (M.D. Fla. 2013) (alteration added; citation omitted).

The equitable estoppel defense applies where there is "(1) a misrepresentation of material fact by a party, which is contrary to a later asserted representation or position by that party; (2) reliance on that representation by the party claiming estoppel; and (3) a detrimental change in the position of the party claiming estoppel caused by the party's reliance on the misrepresentation." *Wacker Chem. Corp. v. Nebula Glass Int'l, Inc.*, No. 10-62130-Civ, 2012 WL 13005460, at *5 (S.D. Fla. Feb. 17, 2012) (quotation marks and citation omitted). "The essence of estoppel is that a person should not be permitted to unfairly assert inconsistent positions[.]" *Id.* (alteration added; quotation marks and citation omitted).

Relatedly, to prove the affirmative defense of laches, a defendant must demonstrate:

(1) conduct on the part of the defendant giving rise to the situation of which the complaint is made; (2) failure of the plaintiff to assert his or her rights by suit, even though the plaintiff has had knowledge of the defendant's conduct and has been afforded the opportunity to institute suit; (3) lack of knowledge on the defendant's part that the plaintiff would assert the right on which he or she bases the suit; and (4) injury or prejudice to the defendant in the event relief is accorded to the plaintiff or the suit is held not to be barred.

*Dep't of Revenue ex rel. Thorman v. Holley*, 86 So. 3d 1199, 1203 (Fla. 1st DCA 2012) (citing *McIlmoil v. McIlmoil*, 784 So. 2d 557, 563 (Fla. 1st DCA 2001)). "Delay alone in asserting a right does not constitute laches, and the burden is on the party who asserts the doctrine of laches to prove prejudice." *Ticktin v. Kearin*, 807 So. 2d 659, 663 (Fla. 3d DCA 2001) (citations omitted).

Plaintiffs knew of and were involved in the conversations with the reinsurance professionals and were aware they were being considered as prospective employees that could

compete with Plaintiffs.  Soria and Rodriguez even personally met with some of the professionals and expressed support for them.

Plaintiffs never objected to these conversations.  Soria testified only that he did not want to give up prospects in the health plan space if anyone was hired (which never occurred and could have been addressed separately, as with Blake Kirk).  None of the Cardinal Members ever objected to EPIC's conversations with the reinsurance professionals or cited the parties' written agreements as obstacles.  Instead, Plaintiffs sat silent, participated in the conduct they now complain of, accepted their salaries and other benefits under the written agreements, and did not identify the conduct as wrongful until filing suit in September 2022 — over a year after EPIC began employment discussions with the reinsurance professionals.  EPIC relied on Plaintiffs' position in continuing to interview the professionals.

In sum, even assuming Plaintiffs proved their unsuccessful claims, Plaintiffs' conduct amounts to waiver, acquiescence, and ratification.  Also, Plaintiffs are equitably estopped and barred by the doctrine of laches from now taking the position that the conversations with other reinsurance professionals amounted to a breach of contract.

 EPIC has not, however, produced sufficient evidence that these affirmative defenses are applicable to the Cardinal Members' theory that EPIC breached the Employment Agreements when Robinson disparaged the Members through his statements that they could not make the transition from underwriters to brokers.  The statements were made after this litigation commenced and the Cardinal Members were terminated.  There is no indication that the Cardinal Members knew the statements were made until after the fact; and all evidence shows that upon learning of the statements, the Members considered the statements an additional breach of the Employment Agreements and pressed that theory accordingly.  Thus, while the Court agrees that EPIC's

affirmative defenses bar Plaintiffs' claims insofar as they arise from EPIC's communications with the reinsurance professionals, the defenses do not bar the Cardinal Members' breach-of-contract claim premised on Robinson's disparaging statements.

2.     *Unclean Hands, Hindrance of Performance, Prior Breach, and Failure to Mitigate*

EPIC contends that Plaintiffs should not be awarded damages because they have unclean hands, hindered performance of the contracts, and failed to mitigate their damages. The Court agrees that Plaintiffs failed to mitigate their damages but rejects EPIC's other defenses.

To establish the defense of unclean hands, a defendant must show that: (1) "the plaintiff's wrongdoing is directly related to the claim against which it is asserted; and (2) the defendant was personally injured by plaintiff's conduct." *McGlothan v. Walmart Stores, Inc.*, No. 06-cv-94, 2006 WL 1679592, at *3 n.3 (M.D. Fla. June 14, 2006) (quotation marks and citation omitted). EPIC's defense of unclean hands does not apply "[w]here, as here, a plaintiff seeks to recover only damages[.]" *Regions Bank v. Old Jupiter, LLC*, No. 10-80188-Civ, 2010 WL 5148467, at *6 (S.D. Fla. Dec. 13, 2010) (alterations added; citation omitted). Even if the defense applied, EPIC has failed to demonstrate it was injured by Plaintiffs' conduct.

Regarding hindrance of performance, "[i]t is a fundamental principle of Florida contract law that a material breach by one party excuses the performance by the other." *Hamilton v. Suntrust Mortg., Inc.*, 6 F. Supp. 3d 1300, 1309 (S.D. Fla. 2014) (alteration added; citations omitted). Similarly, parties who prevent performance of a contract by their own acts cannot take advantage of their own wrongs. *See N. Am. Van Lines v. Collyer*, 616 So. 2d 177, 179 (Fla. 5th DCA 1993). And "when a person contracts for the doing of a certain thing with another, he impliedly promises that he will not himself do anything to hinder or obstruct the performance by the other person." *Thurston v. Jayco, Inc.*, No. 19-cv-293, 2020 WL 5534544, at *4 (M.D. Fla.

June 26, 2020) (quotation marks and citations omitted).  Here, assuming Plaintiffs had established EPIC's liability, EPIC has not shown that Plaintiffs prevented EPIC's performance of the contracts or otherwise materially breached the agreements, excusing EPIC's performance.  While Plaintiffs stated they could not write new business starting in January 2022, it is unclear how this conduct breached the APA or Employment Agreements or otherwise obstructed EPIC's performance.

As to the mitigation defense, a party must "exercise reasonable diligence in mitigating its damages." *Scotlynn USA Div., Inc. v. Titan Trans Corp.*, 555 F. Supp. 3d 1246, 1273 (M.D. Fla. 2021) (citation omitted).  When Plaintiffs elected not to pursue any new business generation after January 2022, EPIC confirmed it would honor the APA and continued to support Cardinal.  Assuming Cardinal had proved EPIC breached the APA and implied covenant of good faith and fair dealing, Cardinal failed to take any steps to mitigate any damages arising from the claimed breaches.

"The failure to mitigate damages defense, however, is not a defense to liability on the contract claims." *Branch Banking & Tr. Co. v. S&S Dev., Inc.*, No. 13-cv-2776, 2015 WL 12683834, at *12 (M.D. Fla. June 30, 2015) (citing *Jackson v. Anderson*, 230 So. 2d 503, 503 (Fla. 2d DCA 1970)).  Thus, while the Court agrees that Cardinal failed to take reasonable steps to mitigate its damages, this failure does not preclude liability and instead can only reduce Cardinal's damages. *See id.*  In any event, since Cardinal failed to prove any breach of the APA or implied covenant and did not sufficiently establish damages from Robinson's disparaging comments, the Court need not address to what extent damages should be reduced by the failure to mitigate.

## IV.  CONCLUSION

In sum, Cardinal failed to show that EPIC breached the APA or the implied covenant of good faith and fair dealing.  Although the Cardinal Members failed to show that EPIC breached

section 10 of the Employment Agreements by communicating with other reinsurance professionals about potential employment at EPIC, they successfully demonstrated that EPIC breached the Employment Agreements by reducing the Cardinal Members' salaries below the contracted-for amount and disparaging the Members after their termination.  As damages for breach of section 6.1 of the Employment Agreements, Soria is entitled to $1,034.86; Rodriguez is entitled to $847.25; and Knopp and Baker are each entitled to $752.44.  Plaintiffs failed to provide a sufficient measure of damages for any other claim, including damages caused by the disparagement.  Thus, with respect to the breach of section 10 of the Employment Agreements, the Cardinal Members are entitled only to nominal damages of $1.00 each.

The Court will enter final judgment by separate order.  The Court reserves jurisdiction to address any forthcoming request(s) for attorney's fees and/or costs.  No motion for fees or costs may be submitted until the time for filing a notice of appeal has passed; if a party appeals the final judgment, no motion for fees or costs may be filed until resolution of the appeal.

**DONE AND ORDERED** in Miami, Florida, this 16th day of April, 2024.

_____
**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:      counsel of record